IN THE COURT OF APPEALS OF NORTH CAROLINA

 No. COA18-770

 Filed: 3 September 2019

N.C. Industrial Commission, I.C. No. 240941

GAIL CANUP HINSON, Executrix of the ESTATE OF WALTER DUNBAR HINSON,
Deceased-Employee, Plaintiff-Appellant,

 v.

CONTINENTAL TIRE THE AMERICAS, SELF-INSURED, Employer-Defendant-
Appellee.

PART OF THE CONTINENTAL TIRE THE AMERICAS CONSOLIDATED
ASBESTOS MATTERS.

 Appeal by Plaintiff from opinion and award entered 25 January 2018 by the

North Carolina Industrial Commission. Heard in the Court of Appeals 12 March

2019.

 Wallace and Graham, PA, by Edward L. Pauley, for Plaintiff-Appellant.

 Fox Rothschild LLP, by Jeri L. Whitfield and Lisa K. Shortt, for Defendant-
 Appellee.

 McGEE, Chief Judge.

 This appeal is companion to four additional appeals, COA18-766, COA18-767,

COA18-768, and COA18-769 (all five together, the “bellwether cases”), consolidated

for hearing by order of this Court entered 8 June 2018. The four companion appeals

will be decided by opinions filed concurrently with this opinion.

 I. Procedural History
 HINSON V. CONT’L TIRE THE AMS.
 Opinion of the Court

 Decedent Walter Dunbar Hinson (“Plaintiff Hinson”) worked for Continental

Tire the Americas (“Defendant”) at Defendant’s tire factory (the “factory”) in

Charlotte from 1967 until 1999.1 This case and the other bellwether cases involve

workers’ compensation claims based on allegations that Plaintiff Hinson, along with

the additional four plaintiffs2 in the bellwether cases (“Bellwether Plaintiffs”), were

exposed to levels of harmful airborne asbestos sufficient to cause asbestos-related

diseases, including asbestosis.3 The bellwether cases constitute a small percentage

of a much larger number of related claims that were consolidated by the Industrial

Commission (the “consolidated cases”).4 Determination of the bellwether cases will

impact not only the Bellwether Plaintiffs, but also the remaining plaintiffs from the

consolidated cases (together with the Bellwether Plaintiffs, “Plaintiffs” or

“Consolidated Plaintiffs”). The Full Commission (the “Commission”) explained the

unique procedure that was adopted to handle the large volume of consolidated cases

in five opinions and awards, entered on 25 January 2018, that decided the bellwether

cases:

 This case is part of a large group of cases (currently
 numbering 144) alleging occupational exposure to asbestos
 at [the] factory. The large group of [P]laintiffs contends

 1 The factory was initially operated under the General Tire name.
 2 Douglas M. Epps, Bobby James Newell, Frank Lee Welch, and Charles Edward Wilson.
 3 Plaintiff Hinson filed a Form 18B with the Industrial Commission, completed 23 May 2002,

alleging he had developed asbestosis as a result of exposure to asbestos while an employee at the
factory.
 4 The Commission’s 25 January 2018 opinion and award states that there were “currently” 144

consolidated cases. However, the number of consolidated cases has fluctuated. Both Plaintiffs and
Defendant moved to consolidate these cases.

 -2-
 HINSON V. CONT’L TIRE THE AMS.
 Opinion of the Court

that they developed asbestos-related disease, primarily
asbestosis, caused by exposure to asbestos at the
. . . factory[.] Defendant denied that the diagnoses of
asbestosis were valid, and also denied that any employee
could develop an asbestos-related disease as a result of
employment with [D]efendant because there was
insufficient exposure to asbestos in [the] factory.

[The consolidated cases] were postured so that there would
be an “initial six” cases to be tried as bellwether cases.
Although the 144 cases had many issues and facts in
common, it was an impossibly large number to try
individually, and too difficult to manage in one joint
hearing. Therefore, [P]laintiffs’ counsel selected a group of
six representative bellwether cases to be tried together in
a consolidated manner. The evidence presented in this
consolidated hearing regarding the factory, [asbestos]
exposures to employees, the criteria for the diagnosis of
asbestosis, the scientific evidence regarding asbestos
exposure, and the potential for disease causation would be
common to, and thus universally applicable to, all 144
claims. The parties agreed that evidence on the general
issues was to be part of the record for all [consolidated
cases], to the extent the evidence was applicable to each
[P]laintiff’s issues. The [B]ellwether [P]laintiffs’ individual
medical and employment histories would be addressed, as
would scientific evidence applicable to all 144 claims
regarding asbestos-related-disease-causing capabilities,
including the exposure and medical causation testimony.
In addressing the bellwether cases first and presenting
evidence applicable to all extant claims, the assumption
was that after the six cases proceeded through trial,
decision and appeal, the parties would be in a better
position to evaluate the remaining claims. The remaining
[consolidated cases] could then be potentially resolved, or
they could proceed to abbreviated hearings for the
introduction of evidence regarding their individual medical
and employment information.

One of these “initial six” [Bellwether P]laintiffs, Kirkland
. . ., filed a Notice of Voluntary Dismissal with Prejudice on

 -3-
 HINSON V. CONT’L TIRE THE AMS.
 Opinion of the Court

 13 November 2012. This left five Bellwether Plaintiffs to
 proceed through trial, decision, and appeal.5 While under
 the jurisdiction of former Deputy Commissioner George
 Glenn, these matters were set on a course unlike that of
 most workers’ compensation cases, in that each side was
 given the opportunity to have a “full trial on the science”—
 with freedom to prosecute the cases according to the civil
 procedure used in superior court. The parties were
 permitted to take as many pre-hearing depositions as they
 wished and could call as many hearing witnesses as they
 determined to be necessary. The [B]ellwether [P]laintiffs’
 cases were heard together in a consolidated posture by
 former Deputy Commissioner Gheen on a special-set basis
 in various locations over the course of thirty-eight hearing
 days beginning 14 February 2011 and concluding 18
 February 2013. Former Deputy Commissioner Gheen’s
 hearing of these claims also involved substantial pre-trial
 proceedings.[6] Much of the evidence presented was
 “common” evidence applicable to all 144 extant claims.

 . . . . The Full Commission has reviewed and considered all
 hearing and deposition transcripts, along with all
 evidentiary exhibits, arguments, and briefs in reaching a
 decision in this claim.

 After hearings had already commenced, the deputy commissioner entered a 27

July 2012 order requiring that “Plaintiffs who die during the pendency of these claims

shall have at least 30 blocks of lung tissue preserved for autopsy and examination by

an expert of Defendant’s choice.” The deputy commissioner based this order on the

following findings and reasoning:

 [Defendant] denies that any of its employees, including
 claimants, would have had sufficient exposure to asbestos

 5 These five Bellwether Plaintiffs are the five Plaintiffs currently before us in the associated
appeals.
 6 Three different deputy commissioners had been involved in the consolidated cases through
entry of the initial opinions and awards for the bellwether cases by the deputy commissioner.

 -4-
 HINSON V. CONT’L TIRE THE AMS.
 Opinion of the Court

 from working at its facility to either cause or contribute to
 an asbestos related disease. It has presented the testimony
 of multiple credible expert witnesses in support of this
 defense.

 [] Plaintiffs’ claims against [Defendant] are based, in part,
 on a “B-read” of an x-ray provided by Plaintiffs’ expert.[7]
 As testified by the medical experts, radiological studies are
 only effective at identifying abnormal features on the x-ray
 that may be consistent with the disease of asbestosis, but
 also may be consistent with multiple other lung diseases.
 In order to make a diagnosis of asbestosis, a physician is
 called upon to rule out other possible conditions.

 [] The medical experts representing both parties have
 repeatedly testified that the only way to positively identify
 whether or not a lung condition or other cancer is caused
 by asbestos exposure is to take a sample of and examine
 the actual lung tissue. However, due to the risks involved,
 this procedure is not done while the patient is alive; it is
 commonly performed at autopsy.

Therefore, the deputy commissioner ordered that Plaintiffs save lung tissue of any

Plaintiffs who died so that their lung tissue could be examined. Plaintiffs did not

fully comply with this order.

 The deputy commissioner reasoned in a 30 April 2013 order: “The diagnoses

[of asbestosis], or lack thereof, by the experts is based on the reading of the same

radiology. Both sides argue the veracity of their own experts.” “Given the opposing

medical findings, . . . the undersigned Deputy Commissioner suggested to the

parties” that they “jointly agree to independent medical experts or to experts chosen

 7 See findings of fact 25 to 28, below, for an explanation of the “B-read” process.

 -5-
 HINSON V. CONT’L TIRE THE AMS.
 Opinion of the Court

by the Industrial Commission to review the radiology and any other relevant medical

evidence, which experts’ opinion both parties would accept as final.” “Alternatively

the parties debated whether the Plaintiffs should be compelled to submit to a high

resolution computed tomography (hereinafter ‘HRCT’) scan to be interpreted by a

physician selected by the Commission in order to determine the presence or absence

of asbestosis.” Defendant agreed to the suggestion, and agreed to pay for the HRCT

scans and associated costs, but Plaintiffs did not agree.

 During the hearings, “[m]uch of the evidence presented was ‘common’ evidence

applicable to all 144 extant claims.” Due to the resignation of the deputy

commissioner who had presided over the hearings, the consolidated cases were

assigned to a different deputy commissioner on 15 April 2015. Plaintiffs and

Defendant completed submission of evidence to the deputy commissioner, and made

their closing oral arguments on 26 and 27 January 2016. The deputy commissioner

filed his opinions and awards in the bellwether cases on 19 December 2016, denying

the claims of all five Bellwether Plaintiffs. Plaintiffs appealed to the Full Commission

on 21 December 2016. The Commission heard the matters on 29 June 2017, and also

denied Plaintiffs’ claims by five opinions and awards entered 25 January 2018. The

five 25 January 2018 opinions and awards filed in the consolidated cases each contain

findings of fact common to all claims, which also include the ultimate findings and

conclusions of law common to all claims. Following the common findings and

conclusions, each of the five opinions and awards before us contain findings of fact

 -6-
 HINSON V. CONT’L TIRE THE AMS.
 Opinion of the Court

and conclusions of law sections that are specific to each individual Bellwether

Plaintiff, as well as the Commission’s rulings denying each of the Bellwether

Plaintiffs’ claims.

 Bellwether Plaintiffs appealed, and Plaintiffs and Defendant filed a motion

with this Court on 30 May 2018 requesting consolidation of the bellwether cases for

appeal.8 This Court ordered that a single record be submitted for all five bellwether

cases, and that: “The parties shall each submit one general brief addressing common

issues and five specific briefs addressing individual [P]laintiff issues.” Plaintiffs and

Defendant each filed a single “general brief”—ostensibly the “general brief addressing

common issues” ordered by this Court. Plaintiffs’ general brief is in reality the

statement of facts for Plaintiffs’ individual briefs. In addition, each of the five

Bellwether Plaintiffs filed “specific” individual appellant briefs that are nearly

identical, and almost exclusively argue common issues. Defendant responded to the

Bellwether Plaintiffs’ individual briefs by filing five separate appellee briefs

addressing the issues specific to each of the five Bellwether Plaintiffs. Although

Plaintiffs’ individual briefs do not address the “common issues” separately from the

“individual issues,” we address all Plaintiffs’ arguments concerning the “common

issues” that were decided in the Commission’s 25 January 2018 opinions and awards

in this opinion—COA18-770. Our holdings for the “common issues” will be

 8 Because the “common issues” sections of the 25 January 2018 opinions and awards apply to
all Consolidated Plaintiffs, we treat them as appellants as well.

 -7-
 HINSON V. CONT’L TIRE THE AMS.
 Opinion of the Court

incorporated by reference in our opinions for the remaining four bellwether cases—

COA18-766, COA18-767, COA18-768, and COA18-769. The “individual issues” will

be addressed separately in each opinion.

 II. General Factual History

 Plaintiffs all allege they were exposed to asbestos while working at the factory,

and further allege they developed compensable asbestos-related diseases as a result.

As explained in a Fact Sheet published by the National Cancer Institute (“NCI”)—

which was entered into evidence:9

 Asbestos is the name given to a group of minerals that
 occur naturally in the environment as bundles of fibers
 that can be separated into thin, durable threads. These
 fibers are resistant to heat, fire, and chemicals and do not
 conduct electricity. For these reasons, asbestos has been
 used widely in many industries.

 ....

 Asbestos minerals are divided into two major groups:
 Serpentine asbestos and amphibole asbestos. Serpentine
 asbestos includes the mineral chrysotile, which has long,
 curly fibers that can be woven. Chrysotile asbestos is the
 form that has been used most widely in commercial
 applications. Amphibole asbestos has straight, needle-like
 fibers that are more brittle than those of serpentine
 asbestos and are more limited in their ability to be
 fabricated.

 9 We include this NCI publication as a general introduction to asbestos, asbestos-exposure,
and related disease. This is just one piece of evidence considered by the Commission—it was not
specifically adopted by the Commission in its opinions and awards.

 -8-
 HINSON V. CONT’L TIRE THE AMS.
 Opinion of the Court

National Cancer Institute, U.S. Department of Health and Human Services, Fact

Sheet: Asbestos Exposure and Cancer Risk 1 (1 May 2009) (“NCI Fact Sheet”)

(citations omitted). According to the NCI Fact Sheet:

 People may be exposed to asbestos in their workplace, their
 communities, or their homes. If products containing
 asbestos are disturbed, tiny asbestos fibers are released
 into the air. When asbestos fibers are breathed in, they
 may get trapped in the lungs and remain there for a long
 time. Over time, these fibers can accumulate and cause
 scarring and inflammation, which can affect breathing and
 lead to serious health problems.

 . . . . According to [the International Agency for Research
 on Cancer], there is sufficient evidence that asbestos
 causes mesothelioma (a relatively rare cancer of the thin
 membranes that line the chest and abdomen), and cancers
 of the lung, larynx, and ovary. Although rare,
 mesothelioma is the most common form of cancer
 associated with asbestos exposure. There is limited
 evidence that asbestos exposure is linked to increased risks
 of cancers of the stomach, pharynx, and colorectum.

 Asbestos exposure may also increase the risk of asbestosis
 (an inflammatory condition affecting the lungs that can
 cause shortness of breath, coughing, and permanent lung
 damage) and other nonmalignant lung and pleural
 disorders, including pleural plaques (changes in the
 membranes surrounding the lung), pleural thickening, and
 benign pleural effusions (abnormal collections of fluid
 between the thin layers of tissue lining the lungs and the
 wall of the chest cavity).

 ....

 Everyone is exposed to asbestos at some time during their
 life. Low levels of asbestos are present in the air, water,
 and soil. However, most people do not become ill from their
 exposure. People who become ill from asbestos are usually

 -9-
 HINSON V. CONT’L TIRE THE AMS.
 Opinion of the Court

 those who are exposed to it on a regular basis, most often
 in a job where they work directly with the material or
 through substantial environmental contact.

 ....

 Although it is clear that the health risks from asbestos
 exposure increase with heavier exposure and longer
 exposure time, investigators have found asbestos-related
 diseases in individuals with only brief exposures.
 Generally, those who develop asbestos-related diseases
 show no signs of illness for a long time after exposure. It
 can take from 10 to 40 years or more for symptoms of an
 asbestos-related condition to appear.

 ....

 Several factors can help to determine how asbestos
 exposure affects an individual, including:

 • Dose (how much asbestos an individual was exposed
 to).
 • Duration (how long an individual was exposed).
 • Size, shape, and chemical makeup of the asbestos
 fibers.
 • Source of the exposure.
 • Individual risk factors, such as smoking and pre-
 existing lung disease.

 Although all forms of asbestos are considered hazardous,
 different types of asbestos fibers may be associated with
 different health risks. For example, the results of several
 studies suggest that amphibole forms of asbestos may be
 more harmful than chrysotile, particularly for
 mesothelioma risk, because they tend to stay in the lungs
 for a longer period of time.

Id. at 2-3 (citations omitted). The NCI Fact Sheet also states that initial examination

for someone who suspects they may have an asbestos-related disease would generally

 - 10 -
 HINSON V. CONT’L TIRE THE AMS.
 Opinion of the Court

include “[a] thorough physical examination, including a chest x-ray and lung function

tests[.] . . . . Although chest x-rays cannot detect asbestos fibers in the lungs, they

can help identify any early signs of lung disease resulting from asbestos exposure.”

Id. at 4 (citations omitted). However, the NCI further stated: “A lung biopsy, which

detects microscopic asbestos fibers in pieces of lung tissue removed by surgery, is the

most reliable test to confirm exposure to asbestos.” Id.

 Plaintiffs worked in different sections of the factory, but all allege they were

exposed to airborne asbestos in quantities and of a type sufficient to cause asbestos-

related diseases—primarily asbestosis. The Commission made the following relevant

findings of fact related to the “common issues” raised by Plaintiffs’ claims:

 1. Asbestos is a generic term for a group of six naturally-
 occurring, fibrous silicate minerals that are ubiquitous in
 ambient air. The general public is exposed to asbestos from
 natural and artificial sources through food, water, and in
 other ways. The background level of asbestos to which the
 general public is exposed varies based on several factors
 including geography and proximity to urban centers. Low
 levels of asbestos can be found in the lungs of virtually
 100% of the general population. [N.C.G.S.] § 97-62 defines
 asbestosis as “a characteristic fibrotic condition of the
 lungs caused by the inhalation of asbestos dust.”

 2. Plaintiffs allege that they contracted asbestosis caused
 by exposure to airborne asbestos during employment with
 [D]efendant at the . . . factory[.] Additionally, some
 Plaintiffs allege that they also contracted diseases other
 than asbestosis caused by exposure to airborne asbestos
 during employment at [the] factory. Asbestos is not a tire
 component. The [P]laintiffs allege workplace exposure in
 the factory from one or more of four main sources: 1)
 airborne asbestos originating from damaged or

 - 11 -
 HINSON V. CONT’L TIRE THE AMS.
 Opinion of the Court

deteriorated asbestos-containing pipe insulation; 2)
powdered talc allegedly contaminated with asbestos used
as a non-stick agent in certain areas of the factory; 3)
asbestos-containing dust released into the air by sawing
and/or otherwise working with asbestos-containing
gaskets; and 4) airborne asbestos-containing brake dust
that allegedly emanated from forklifts and other factory
vehicles during maintenance and use. Plaintiffs allege that
they were exposed to asbestos through one or more of these
methods in such form and quantity and with such
frequency that it caused asbestosis.

3. The . . . factory was constructed in the late 1960s and
began manufacturing tires by 1969. . . . . The factory
ceased tire production on 4 July 2006. . . . .

4. The tire-making process began in the Banbury/mixing
department, a three-story area open to the rest of the
factory. On the top floor of the Banbury/mixing area,
chemicals and rubber were received, weighed, and mixed.
On the second floor of this area, these raw materials were
put into heated mixing machines. From these mixers the
material was dropped down chutes to the mills on the main
floor. The mills pressed the chunks of rubber material into
sheets. The sheets of rubber were then hung on a line and
dried using fans. Once dry, the sheets were put on pallets
and sent to the “calendaring and extruding” area.

5. In the calendaring and extruding area, the rubber
material was compressed into different thicknesses,
shapes, and sizes for eventual use as the different
components of a tire. . . . . The compressed rubber was
then transferred to the “stock prep” area, where it was cut
to the correct dimensions for tire building.

6. In the “tire building” area, all of the tire pieces were
layered together and pressed in a tire-building machine.
. . . . The “green tires” were then transported to the curing
department.

7. There were 147 clam-shell-shaped curing presses/ovens

 - 12 -
 HINSON V. CONT’L TIRE THE AMS.
 Opinion of the Court

in the curing department. . . . . The curing process, during
which the “green tires” were placed in a mold and
vulcanized under heat and pressure, was very hot and was
operated by steam. For this reason, the curing area had
more condensate and steam piping than any other area in
the factory. Much of this piping was located in trenches
that ran to the curing presses/ovens.

8. After curing, the tires went to the “final finish” area
where they were trimmed, cleaned, and inspected. The
tires that passed inspection were put on pallets and
transported to the warehouse[.]

9. Steam and condensate pipes ran throughout the factory.
. . . . There were at least 26,180 linear feet of insulated
steam and condensate piping in the factory. The insulation
was comprised of one to two inches of an
asbestos-containing cement, Thermobestos, encapsulating
the steam and condensate pipes. The pipes had protective
canvas and glue surrounding the Thermobestos. Asbestos
insulation was removed from the market in the early 1970s
and, as such, expansions at the . . . factory after a certain
date would not have included the installation of asbestos-
encapsulated piping. Most of the insulated steam and
condensate piping was at ceiling level, 20-30 feet above the
factory floor, or below floor level in the trenches that ran
between and into the curing presses. The floor-level and
trench-level pipe insulation was susceptible to damage by
foot traffic. Forklifts could damage floor-level pipe
insulation and also could damage pipe insulation at higher
levels. For example, while stacking tires high in the
warehouse, it was possible for the forklift payloads to strike
the insulated piping.

10. Plaintiffs allege exposure to airborne asbestos
originating from deteriorated pipe insulation. Plaintiffs
allege that it was damaged through external molestation
by workers walking on pipes, climbing on pipes, and
striking the pipes with forklifts and forklift payloads.
Plaintiffs also argue that internal pipe damage from
ruptures forced steam to leak out of the pipes with

 - 13 -
 HINSON V. CONT’L TIRE THE AMS.
 Opinion of the Court

sufficient force to cause insulation damage and cause
asbestos to become airborne. Plaintiffs further allege that
workers used compressed air near the damaged insulation,
causing asbestos to become airborne. There is conflicting
evidence regarding the amount of pipe insulation damage
present at [the] factory.

11. The highest concentration of insulated piping in the
factory existed in the curing department, with much of the
piping at or below floor level. Plaintiffs allege that workers
used a band saw to cut large asbestos-containing gaskets
in the curing department. If [P]laintiffs’ allegations are
correct, it would be logical to expect high levels of airborne
particulates in the curing department originating from
damaged pipe insulation and gasket-sawing. However, the
greater weight of the evidence does not support this
conclusion.

12. In 1979, the . . . factory took part in an air contaminant
assessment study in conjunction with The National
Institute for Occupational Safety and Health (hereinafter
“NIOSH”). At the time, NIOSH was studying the best
methods and technologies to control air quality in the tire
industry. The report reflects that [the] factory was
selected for the study because it had “among the better
controls for air contaminants in the industry.” NIOSH
performed area and personal air monitoring in each area of
the plant that it expected to find measurable dust or
emissions. Specifically, NIOSH measured for dust—both
airborne and respirable, as well as petroleum distillates,
rubber solvent, Benzene, and Toulene. The dust
measurements would have measured any particulates in
the air—whether the particulates were asbestos, talc, or
something else. The 1979 NIOSH dust measurements
found that the measured dust levels in the curing
department were 1/100th of the permissible level. This was
possibly due to the curing department’s powerful exhaust
system, which drew air up and out of the area. Except for
an outlier measurement created by an employee jumping
up and down in a dusty trash bin, the 1979 dust
measurements at [the] factory were five to ten times less

 - 14 -
 HINSON V. CONT’L TIRE THE AMS.
 Opinion of the Court

than the permissible exposure level (hereinafter “PEL”) in
place in 2013. NIOSH concluded that the particulate and
vapor concentrations at [the factory] were well below the
PEL established by the Occupational Safety and Health
Administration (hereinafter OSHA), NIOSH, and the
American Conference of Governmental Industrial
Hygienists. NIOSH also concluded that the environmental
controls (exhaust and ventilation systems) were effective.

13. There was also environmental air sampling for asbestos
at [the] factory in 1985 when asbestos-containing
insulation was removed from a furnace on the third floor of
the mixing area. This sampling was done with background
air monitoring as well as with personal air monitors on the
personnel conducting the removal. In 1985, there were no
regulations regarding wetting down insulation as it was
removed. Therefore, the air measurements taken during
this removal process record a scenario very favorable for
the creation of airborne dust. However, the 1985
background air monitoring that took place showed results
well below the then-current OSHA PEL. The highest
recorded personal air monitoring result during the removal
was also below the then-existing OSHA PEL.

14. As a result of the 1986 federal asbestos regulations,
large-scale asbestos abatement procedures were
undertaken at [the] factory. This process required pre-
abatement area air quality monitoring to measure pre-
removal levels. For this reason, there were background air
samples collected for abatement projects in 1989 (curing),
1995 (calendar and extruding), and 2003 (powerhouse). In
all of these areas, these measurements show that at no
time was the potential exposure above the OSHA PEL.
Background monitoring reflected levels to which the public
at large is exposed.

15. In areas with ceiling-level piping, such as the
warehouse, the evidence demonstrates that any small
amount of asbestos potentially disturbed and released at
ceiling level due to pipe insulation damage would have
dissipated before reaching workers and would not have

 - 15 -
 HINSON V. CONT’L TIRE THE AMS.
 Opinion of the Court

created any meaningful exposure.

....

17. Plaintiffs also allege exposure to asbestos through the
inhalation of powdered talc which they allege contained
asbestos. Talc is used ubiquitously by the general
population in things such as makeup and baby powder. It
is the most common non-asbestos mineral found in general
population lung tissue. Talc was used in [the] factory as a
non-stick agent. However, the amount of talc used in the
. . . factory is a contested factual issue. Defendant avers
that routinely, workers mistook other powdery materials
used in great quantities at the factory for talc. Specifically,
[D]efendant contends that clay [kaolin], calcium carbonate,
and zinc oxide were commonly used in vastly larger
quantities and were routinely incorrectly referred to by the
workers as “talc.” . . . .

18. While talc from certain mines is known to be
contaminated by asbestos, there was disagreement among
the experts regarding the likelihood of asbestos being a
contaminant in the talc used at [the] plant. Furthermore,
in 1995, air monitoring was done in the calendaring area
while calendaring work continued. Plaintiffs allege
significant talc usage in this area. If [P]laintiffs’
allegations are correct, it would be logical to expect high
levels of airborne particulates in calendaring. However,
the 1995 measurements, performed as calendaring work
continued, found airborne particulate levels well below the
then-existing OSHA PEL, and EPA clearance levels.

....

20. . . . . There was contradicting testimony on the issue
of cutting gaskets—with some witnesses testifying that
gaskets came from the manufacturer already made to fit
and did not require any sawing and other testimony that
any such sawing, if it took place, would have been done in
the maintenance shop, not in curing.

 - 16 -
 HINSON V. CONT’L TIRE THE AMS.
 Opinion of the Court

....

24. In 1986, federal government regulations mandated new
procedures to identify, encapsulate, and abate workplace
asbestos. As part of these new regulations, in 1987, certain
employees at [the] factory were trained for the possibility
that small asbestos removals would have to be performed
by [Defendant’s] employees. . . . . All removal and
abatement procedures were performed by outside
contractors. Subsequent to the 1986 regulations, the new
asbestos management policies were made known to all
employees, masks were provided, and safety protocols,
such as the prohibition of using compressed air on damaged
insulation, were enacted. Furthermore, known asbestos-
containing materials were labeled, encapsulated, and
removed.

25. An asbestosis B-read is a test in which NIOSH-certified
physicians view a patient’s chest x-ray and score it from 0/0
(for normal lungs) through 3/3 (for lungs with severe
disease). B-readers become certified (and re-certified every
4 years) based on their tested proficiency in scoring a set of
standard x-rays. The first number in a B-read score
reflects that reader’s first impression of the film, with the
second number reflecting a different number if the reader
has a “second thought” or if the reader thinks another B-
reader could arrive at a different conclusion. For example,
a 1/0 score reflects a B-reader’s conclusion that the film is
mildly abnormal, but that another B-reader could read the
film as normal.

26. The 1986 American Thoracic Society criteria required a
B-read to be 1/1 or greater before the result was considered
consistent with asbestosis. The 1986 criteria also stated:
“the benefit of the doubt should be given whenever the
clinical features and occupational exposure data are
compatible with the diagnosis.” The 2004 American
Thoracic Society criteria liberalized the standard to define
a 1/0 read or greater as consistent with asbestosis, but
removed the “benefit of the doubt” language. Many
common non-asbestos-related conditions are consistent

 - 17 -
 HINSON V. CONT’L TIRE THE AMS.
 Opinion of the Court

with a 1/0 B-read. For example, cigarette smoking can
cause opacities consistent with a 1/0 B-read.

27. The [P]laintiffs in these cases took part in a mass
screening of chest x-rays of [Defendant’s] former . . . factory
workers. This mass screening was organized by
[P]laintiffs’ attorneys. These x-rays were reviewed by B-
readers selected by [P]laintiffs’ attorneys. Over 80% of
[P]laintiffs in these cases were evaluated by [P]laintiffs B-
readers to have “1/0” B-reads. Plaintiffs were subsequently
referred by [P]laintiffs’ attorneys for mass diagnostic
examinations at a hotel in Charlotte performed by
pulmonologists selected by [P]laintiffs’ attorneys.

28. Defendant’s B-readers evaluated the [P]laintiffs’ x-rays
as 0/0. This consistent disparity of B-reads, which, by
definition, are meant to be read to a consistent standard,
raises the issue of possible B-reading bias by one or both
sides.

29. Asbestos-related diseases follow a dose-response
relationship—the higher the cumulative [asbestos]
exposure dose, the greater the risk of disease, with
asbestosis generally requiring the highest dose. Pleural
plaques, pleural thickening, and mesothelioma are
asbestos-related conditions that generally form at a lower
dose.

30. In the general population, approximately 80% of people
diagnosed with asbestosis will also have bilateral pleural
plaques. However, experts in these cases only identified
about 10% of the [P]laintiffs diagnosed with asbestosis as
also having bilateral pleural plaques. This outcome is
statistically improbable. Because pleural plaques require
less exposure, it is not logical that such a large group
diagnosed with asbestosis would have so few with pleural
plaques.

31. Pursuant to an order issued by former Deputy
Commissioner Gheen, [D]efendant has been entitled to
autopsies and lung tissue examinations of deceased

 - 18 -
 HINSON V. CONT’L TIRE THE AMS.
 Opinion of the Court

[P]laintiffs to allow pathological examinations. Although
18 [P]laintiffs have died to date, [D]efendant has only been
able to obtain autopsy results and tissue examinations of
five deceased [P]laintiffs—Walter Hinson, Johnnie Jones,
Charles Gibson, Homer Hunt, and Lloyd Cox. Walter
Hinson is the only [Bellwether P]laintiff who had
post-mortem pathology[.]

32. Pathological examination of lung tissue is a definitive
method of determining whether an individual has an
asbestos-related disease. x-rays are inherently limited in
that they can only identify markings that are consistent
with a pneumoconiosis such as asbestosis. These
markings, as seen on radiological scans, can also be
consistent with a number of unrelated conditions and
diseases.

33. The accepted scientific method to diagnose asbestosis
pathologically requires diffuse interstitial fibrosis AND
either two or more asbestos bodies per centimeter squared
OR a count of uncoated asbestos fibers that falls within
that lab’s range for asbestosis (accounting for the
background levels found in that lab’s reference
population/control group). Labs also may have different
methodologies to digest and identify fibers, making cross-
lab comparisons problematic. Asbestos bodies are fibers
that have been coated by the body as a defense mechanism.
Diffuse interstitial fibrosis or scarring can be caused by
numerous things other than asbestosis. Many non-
asbestos-related diseases and conditions can result in a 1/0
B-read.

34. Of the five deceased [P]laintiffs who had post-mortem
pathological study of their lung tissue, (Walter Hinson,
Johnnie Jones, Charles Gibson, Homer Hunt, and Lloyd
Cox), none had pathological evidence of asbestosis.
Pathology is the most reliable method to diagnose
asbestosis.

35. Pursuant to the Helsinki, OSHA, and NIOSH
standards, fibers shorter than 5 micrometers [or microns]

 - 19 -
 HINSON V. CONT’L TIRE THE AMS.
 Opinion of the Court

are not counted pathologically for purposes of asbestosis
diagnosis or risk assessment. Fibers shorter than 5
micrometers, due to their length, are cleared quickly by the
lungs and are not believed to contribute to the disease.
Only fibers longer than 5 micrometers become lodged into
the lung tissue, as they are too big to navigate through the
lymphatic channels to be cleared by a human lung’s
defense mechanisms.

36. Samples of the pipe insulation at the . . . factory show
the presence of two types of asbestos—amosite and
chrysotile. Amosite is an amphibole. Chrysotile is a type
of [serpentine] asbestos, often shorter than five
micrometers, that is particularly susceptible to being
broken down quickly in acidic environments, such as a
human lung. Due to its length and fragility in the human
lung, the clearance half-life of chrysotile asbestos in
humans has been estimated to be a few weeks to a few
months. Plaintiffs argue that the tissue fiber analyses in
these cases under-assessed the number of fibers by not
counting the chrysotile fibers because they are quickly
cleared from the human lung. Many experts believe that
chrysotile asbestos does not cause or contribute to
asbestosis or asbestos-related disease due to its short
clearance half-life and that fact that persistence of a fiber
within the lung is a crucial determinant of its
pathogenicity. By contrast, amphibole asbestos fibers are
not susceptible to being dissolved by lung tissue and have
a clearance half-life in the human body measured in
decades. Because the pipe insulation at the . . . factory had
both chrysotile and amphibole asbestos, the [P]laintiffs’
lung pathology would show occupational exposure, if it
existed, in the form of amphibole fibers.

37. [Plaintiff] Hinson . . . worked for 32 years, mainly in the
curing department. The curing department had the
highest concentration of insulated piping in the factory,
with much of it at floor level or in exposed trenches.
According to [Plaintiff] Hinson, he was also exposed to
significant asbestos dust from using a band saw to cut large
asbestos gaskets. If [P]laintiffs’ arguments are correct,

 - 20 -
 HINSON V. CONT’L TIRE THE AMS.
 Opinion of the Court

[Plaintiff] Hinson would have been exposed to a significant
amount of airborne asbestos. [Plaintiff] Hinson was given
a 1/0 B-read by Dr. James Johnson[.] Dr. Craig Hart at
York pathology performed [P]laintiff Hinson’s lung
autopsy. Dr. Hart found no evidence of asbestos bodies or
fibrosis, but did see evidence of smoking. The tissue was
sent to Dr. Oury, who examined the sample and confirmed
Dr. Hart’s conclusions. Although it was not required for
diagnostic purposes due to the lack of fibrosis, a fiber count
analysis was done by Dr. Oury upon [D]efendant’s request.
The fiber count analysis found 5 asbestos bodies per gram,
which is a level well below that seen in individuals with
asbestosis and in the range of control individuals with no
history of [occupational] asbestos exposure.

38. Decedent Johnnie Jones . . . worked for 25 years in the
calendar area. If [P]laintiffs’ arguments are correct, he
would have been subjected to significant airborne asbestos-
contaminated talc exposure in his workplace environment.
Decedent Johnnie Jones had a 1/0 B read from Dr. Crim.
However, when Dr. Roggli performed a pathological
examination of Jones’ lung tissue, he found no histologic
evidence of asbestosis or elevated asbestos content. Based
on decedent Jones’ employment history at [the factory] and
his pathology results, Dr. Roggli testified that there was
not sufficient exposure to asbestos at the factory . . . to
contribute to or to cause an asbestos-related disease for Mr.
Jones or anyone in his position.

39. Decedent Charles Gibson . . . worked at the . . . factory
. . . for 31 years—holding jobs in the tire-building and
warehouse departments. If [P]laintiffs’ arguments are
correct, Gibson would have been subjected to significant
airborne asbestos exposure in his workplace environment.
Decedent Gibson was found to have a 1/0 B-read according
to Dr. Crim. Decedent Gibson’s lung tissue was collected
by York Pathology Associates after his death. Dr. Jenkins
with York Pathology performed a gross tissue examination.
Dr. Jenkins found no pleural plaques. Dr. Oury also
examined the tissue and found no evidence of pulmonary
fibrosis, no asbestos bodies, and no fibers. Talc and

 - 21 -
 HINSON V. CONT’L TIRE THE AMS.
 Opinion of the Court

vermiculite were found, but the source of these materials
was impossible to discern.

40. Decedent Homer Hunt . . . was employed at the
. . . factory for 17 years as a mechanic—working in all areas
of the factory. Among many other tasks, decedent Hunt
replaced forklift brakes. If [P]laintiffs’ arguments are
correct, decedent Hunt would have been subjected to
significant amounts of airborne asbestos-containing brake
dust in his workplace environment. Decedent Hunt was a
45-year smoker who died of lung cancer in 2012. His lung
tissue was collected by York pathology pursuant to the
Autopsy Order. Dr. Richard Johnson and Dr. Oury
examined decedent Hunt’s lung tissue. No fibrosis was
found in areas of the lung not impacted by the unrelated
carcinoma tumor. Furthermore, there were no asbestos
bodies or fibers found.

41. Decedent Lloyd Cox . . . worked at [the] factory for 31
years in the stock and bead prep area. Decedent Cox died
in 2014 of viral pneumonitis complicated by other factors.
Although decedent Cox had “end stage asbestosis” written
on his death certificate by the Lancaster County coroner,
this diagnosis is of dubious reliability in that it apparently
has little or no scientific basis. The coroner does not have
a college degree and did not consult with the county
pathologist before writing that conclusion on the death
certificate. Decedent Cox’s lung tissue was collected and
examined by York Pathology Associates. Surgical
pathologist Dr. Sporn performed a “transbronchial biopsy.”
Dr. Sporn did not find any asbestos bodies and no condition
was found on the biopsy that would have been caused by or
contributed to by asbestos exposure. Dr. Sporn articulated
that viral pneumonia was the likely cause of death. Dr.
Hart performed the pathology exam, microscopically and
grossly, and found that there was no interstitial fibrosis, no
asbestos bodies, no pleural plaques, no asbestos fibers, and
no evidence of exposure to asbestos above the general
population.

42. Despite [P]laintiffs’ theories of exposure, pathology

 - 22 -
 HINSON V. CONT’L TIRE THE AMS.
 Opinion of the Court

 results from the lung tissue of five long-term employees
 from a variety of departments and factory locations
 uniformly show a lack of fibrosis, a lack of asbestos bodies,
 and a lack of fibers.

 ....

 44. Drs. Ghio, Barrett, Goodman, and Alexander concluded
 that [P]laintiffs did not have findings consistent with
 diagnoses of asbestosis. Given the preponderance of the
 evidence in view of the entire record, their opinions are
 given greater weight than those of Drs. Crim, Ohar,
 Schwartz, and Frank [Plaintiffs’ experts].

Plaintiffs argue that some of these findings are erroneous, incomplete, or misstate

the facts. We will address Plaintiffs’ arguments concerning the findings of fact below.

Based upon these common findings of fact, the Commission determined that Plaintiffs

had not meet their burden of proving they were exposed to levels of hazardous

airborne asbestos capable of causing—or significantly contributing to—their alleged

asbestos-related diseases. Additional facts will be discussed below.

 III. Relevant Workers’ Compensation Law

 A. Standard of Review

 The issues before us are controlled by Article 1, Chapter 97 of the General

Statutes—the “Workers’ Compensation Act” (the “Act”). “The employee seeking

workers’ compensation benefits bears the burden of proving every element of

compensability. The degree of proof required of a claimant under the Act is the

‘greater weight’ or ‘preponderance’ of the evidence.” Hardin v. Motor Panels, Inc., 136

 - 23 -
 HINSON V. CONT’L TIRE THE AMS.
 Opinion of the Court

N.C. App. 351, 354, 524 S.E.2d 368, 371 (2000) (citations omitted). This Court’s

standard of review is well established:

 “Appellate review of an award from the Industrial
 Commission is generally limited to two issues: (i) whether
 the findings of fact are supported by competent evidence,
 and (ii) whether the conclusions of law are justified by the
 findings of fact.” Unchallenged findings of fact are
 presumed to be supported by competent evidence[.] The
 Commission’s conclusions of law are reviewed de novo.

Penegar v. United Parcel Serv., __ N.C. App. __, __, 815 S.E.2d 391, 394 (2018)

(citations omitted). “Whether an injury arose out of and in the course of employment

is a mixed question of law and fact, and the Industrial Commission’s findings in this

regard are conclusive on appeal if supported by competent evidence.” Culpepper v.

Fairfield Sapphire Valley, 93 N.C. App. 242, 247, 377 S.E.2d 777, 780 (1989) (citation

omitted).10 The Commission’s findings, including its ultimate findings, are binding

“when they are supported by direct evidence or by reasonable inferences drawn from

the record.” Kennedy v. Duke Univ. Med. Center, 101 N.C. App. 24, 30, 398 S.E.2d

677, 680 (1990) (citations omitted). “[T]he Commission is required to evaluate the

credibility of the evidence and reject any evidence it finds as not convincing.” Phillips

v. U.S. Air, Inc., 120 N.C. App. 538, 542, 463 S.E.2d 259, 262 (1995) (citation omitted).

 [T]he Commission has sole authority to make findings of
 fact. This Court does not weigh the evidence. We
 determine only whether there is any evidence of substance
 in the record to support the Commission’s findings; if there

 10 We refer to the Commission’s resolution of these mixed questions of law and fact as “ultimate
findings.”

 - 24 -
 HINSON V. CONT’L TIRE THE AMS.
 Opinion of the Court

 is, we are bound by the findings, even though the record
 may contain evidence supporting findings contra. There
 must be a complete lack of competent supporting evidence
 to justify disregarding the Commission’s findings of fact.
 Where medical testimony is conflicting, the Commission
 decides which testimony to give the greater weight.

Carroll v. Burlington Industries, 81 N.C. App. 384, 387-88, 344 S.E.2d 287, 289–90

(1986) (citations omitted).

 B. Workers’ Compensation; Occupational Diseases

 Most, if not all, Consolidated Plaintiffs allege they developed asbestosis as a

result of their work at the factory.11 See N.C.G.S. § 97-53(24) (2017). Two Bellwether

Plaintiffs, Wilson and Epps, alleged they have occupational diseases as defined by

N.C.G.S. § 97-53(13); colon cancer and tonsil cancer, respectively—caused by asbestos

exposure at the factory. Normally, the Commission would first determine whether a

plaintiff had proven an occupational disease, and only after determining that the

plaintiff had met that burden would the Commission consider evidence related to

compensability, or whether the occupational disease had any causal connection to the

plaintiff’s employment. However, for these cases we are asked to review the

Commission’s determinations that conditions at the factory could not have exposed

Consolidated Plaintiffs to airborne asbestos of a type and in sufficient amounts to

cause asbestosis, or other asbestos-related diseases—before the Commission

 11 Or, for deceased Plaintiffs, their estates allege that the deceased Plaintiffs had developed
asbestosis.

 - 25 -
 HINSON V. CONT’L TIRE THE AMS.
 Opinion of the Court

determines whether any Consolidated Plaintiffs actually have asbestos-related

diseases.12 In light of the unusual procedure employed, a review of workers’

compensation law and procedure applicable to cases of alleged compensable asbestos-

related diseases is appropriate.

 “The underlying purpose of [the 1929 adoption of the] Act . . . [wa]s to provide

compensation for workmen who suffer disability by accident arising out of and in the

course of their employment.” Henry v. Leather Co., 234 N.C. 126, 127, 66 S.E.2d 693,

694 (1951). Initially, the Act only allowed compensation for “injury by accident.” See

id. at 127, 66 S.E.2d at 694. However, the Act was amended in 1935 to include

benefits for employees who developed compensable occupational diseases. Id. at 128,

66 S.E.2d at 694–95; N.C.G.S. § 97-52 (2017). The amendment enumerated specific

diseases—like asbestosis—that were designated as “‘occupational diseases within the

meaning of [Article 1].’” Henry, 234 N.C. at 128, 66 S.E.2d at 694 (citation omitted);

N.C.G.S. § 97-53. Later, the Act was amended to allow employees to prove that a

disease not specifically enumerated in N.C.G.S. § 97-53 was a “compensable

occupational disease” based upon the specific facts of the plaintiff’s claim. N.C.G.S.

§ 97-53(13). N.C.G.S. § 97-53(13) states in relevant part: “Any disease . . . which is

proven to be due to causes and conditions which are characteristic of and peculiar to

a particular trade, occupation or employment, but excluding all ordinary diseases of

 12 Excluding the Bellwether Plaintiffs, for whom the Commission has concluded no asbestos-
related diseases have been proven to exist.

 - 26 -
 HINSON V. CONT’L TIRE THE AMS.
 Opinion of the Court

life to which the general public is equally exposed outside of the employment” “shall

be deemed to be [an] occupational disease[] within the meaning of” the Act. N.C.G.S.

§ 97-53(13).

 “[T]he addition of G.S. 97-53 to the Act ‘in nowise relaxed the fundamental

principle which requires proof of causal relation between injury and employment.’”

Booker v. Medical Center, 297 N.C. 458, 475, 256 S.E.2d 189, 200 (1979) (citations

omitted). “It is overwhelmingly apparent that . . . disablement resulting from an

occupational disease . . . must arise out of and in the course of the employment, i.e.,

there must be some causal relation between the injury and the employment[.]”

Morrison v. Burlington Industries, 304 N.C. 1, 12, 282 S.E.2d 458, 466 (1981).

 Now, all provisions of the Act that had formerly applied only to injuries by

accident also apply to compensable occupational diseases—so long as they do not

conflict with more specific provisions in the Act specifically pertaining to occupational

diseases. N.C.G.S. § 97-52. “[A]n employee becoming disabled by asbestosis [or other

occupational disease] . . . within the terms of the specific definition embodied in G.S.

[§] 97-54 should be entitled to ordinary compensation measured by the general

provisions of the . . . Act. G.S. [§] 97-64.” Young v. Whitehall Co., 229 N.C. 360, 366,

49 S.E.2d 797, 801 (1948).

 Therefore, the Act now provides that the terms “injury,” “personal injury,” or

“injury by accident” also encompass “[d]isablement or death of an employee resulting

from an occupational disease described in G.S. 97-53[.]” N.C.G.S. § 97-52; N.C.G.S. §

 - 27 -
 HINSON V. CONT’L TIRE THE AMS.
 Opinion of the Court

97-2(6) (2017) (emphasis added) (“Injury.—‘Injury and personal injury’ shall mean

only injury by accident arising out of and in the course of the employment[.]”); see also

Henry, 234 N.C. at 128, 66 S.E.2d at 694 (citation omitted) (The amendment also

“broadened or extended the meaning of the word ‘accident’ as used in the original Act

so as to include a disablement or death resulting from an occupational disease

described in G.S. § 97-53[.]”). “Nothing is said in [N.C.G.S. § 97-52] or cases

construing it which could be interpreted as allowing compensation for injury from

occupational disease which falls short of ‘disablement.’” Harrell v. Harriet and

Henderson Yarns, 56 N.C. App. 697, 699, 289 S.E.2d 846, 847 (1982); N.C.G.S. § 97-

64 (2017).

 Generally, “disablement” means a diminished ability to earn wages resulting

from an injury sustained due to employment. N.C.G.S. § 97-2(9); N.C.G.S. § 97-54

(2017). “The term ‘disability’ as used in [the Act] means the state of being

incapacitated as the term is used in defining ‘disablement’ in G.S. 97-54[,]” N.C.G.S.

§ 97-55 (2017), and is therefore, in all ways relevant to this opinion, synonymous with

“disablement.” “The term ‘death’ as a basis for a right to compensation means only

death resulting from an injury.” N.C.G.S. § 97-2(10).

 In order to be compensable, a plaintiff-employee must prove, inter alia, that

the plaintiff’s alleged occupational disease, including one—like asbestosis—that is

specifically enumerated in N.C.G.S. § 97-53, “‘was incident to or the result of the

particular employment in which the workman was engaged.’” Booker, 297 N.C. at

 - 28 -
 HINSON V. CONT’L TIRE THE AMS.
 Opinion of the Court

475, 256 S.E.2d at 200 (citation omitted). Stated differently, “to demonstrate a causal

link between the condition for which plaintiff seeks compensation and plaintiff’s

employment[,]” the plaintiff must prove that the plaintiff’s “employment ‘significantly

contributed to, or was a significant causal factor in, the disease’s development.’”

James v. Perdue Farms, Inc., 160 N.C. App. 560, 562, 586 S.E.2d 557, 560 (2003)

(citations omitted). As noted in finding of fact 2, Consolidated Plaintiffs do not argue

that employment at the factory “significantly contributed to” the development of their

alleged asbestosis diagnoses. Instead, “Plaintiffs allege that they were [each] exposed

to asbestos [while working at the factory] in such form and quantity and with such

frequency that it caused asbestosis.” (Emphasis added). Therefore, with respect to

asbestosis, our review will be limited to whether Plaintiffs proved work at the factory

“was a significant causal factor in” development of Plaintiffs’ alleged asbestosis. Id.

 Pursuant to N.C.G.S. § 97-53(13), colon cancer or tonsil cancer

 may be an occupational disease provided the occupation in
 question exposed the worker to a greater risk of contracting
 this disease than members of the public generally, and
 provided the worker’s exposure to [asbestos] significantly
 contributed to, or was a significant causal factor in, the
 disease’s development. This is so even if other non-work-
 related factors also make significant contributions, or were
 significant causal factors.

Rutledge v. Tultex Corp., 308 N.C. 85, 101, 301 S.E.2d 359, 369–70 (1983) (citation

omitted). When determining whether an occupational disease is compensable, “[t]he

factual inquiry . . . should be whether the occupational exposure was such a

 - 29 -
 HINSON V. CONT’L TIRE THE AMS.
 Opinion of the Court

significant factor in the disease’s development that without it the disease would not

have developed to such an extent that it caused the physical disability which resulted

in claimant’s incapacity for work.” Id. at 102, 301 S.E.2d at 370. “[I]f a disease is

produced by some extrinsic or independent agency, it may not be imputed to the

occupation or the employment.” Id. at 103, 301 S.E.2d at 370 (citations omitted).

 Therefore, generally, in order for a claim of occupational disease to be

compensable under the Act, the plaintiff must prove (1) that the plaintiff has an

injury—specifically an occupational disease; (2) that the occupational disease “arose

out of” and “in the course of” some employment, Gallimore v. Marilyn’s Shoes, 292

N.C. 399, 402–03, 233 S.E.2d 529, 531–32 (1977),—i.e. that the “employment

‘significantly contributed to, or was a significant causal factor in, the disease’s

development[,]’” James, 160 N.C. App. at 562, 586 S.E.2d at 560 (citations omitted);

and (3) that the occupational disease resulted in “disability,” N.C.G.S. § 97-54.13 “In

general, the term ‘in the course of’ refers to the time, place and circumstances under

 13 Generally, Plaintiff Hinson’s estate would not need to prove that his employment with
Defendant was the “origin or cause” of his disablement, Penegar, __ N.C. App. at __, 815 S.E.2d at
398—it could prove a causal connection between his alleged asbestosis and any employment prior to
or including his work at the factory. Defendant would then be liable for any disability due to Plaintiff
Hinson’s asbestosis if his estate could also prove that he “was last injuriously exposed to the hazards
of” asbestosis, as defined in N.C.G.S. § 97-57, while working for Defendant. N.C.G.S. § 97-57 (2017).
However, the Commission found as fact that Plaintiffs all “allege that they contracted asbestosis
caused by exposure to airborne asbestos . . . during employment with [D]efendant[,]” and that Plaintiff
“Hinson apparently had no exposure to asbestos through his prior employment.” Plaintiff Hinson’s
Estate does not contest these findings, so it must prove that Plaintiff Hinson developed asbestosis due
to exposure to asbestos while working at the factory—and that his asbestosis led to disablement as
defined by the Act at some point prior to his death. N.C.G.S. § 97-52; N.C.G.S. § 97-2(6); N.C.G.S. §
97-54.

 - 30 -
 HINSON V. CONT’L TIRE THE AMS.
 Opinion of the Court

which an accident occurs, while the term ‘arising out of’ refers to the origin or causal

connection of the accidental injury to the employment.” Gallimore, 292 N.C. at 402–

03, 233 S.E.2d at 531–32 (citations omitted). “In determining whether a claimant’s

[alleged occupational] exposure to [asbestos] has significantly contributed to, or been

a significant causative factor in, [an asbestos-related] disease, the Commission may,

of course, consider medical testimony, but its consideration is not limited to such

testimony.” Rutledge, 308 N.C. at 105, 301 S.E.2d at 372 (citation omitted). Our

Supreme Court has stated:

 In the case of occupational diseases proof of a causal
 connection between the disease and the employee’s
 occupation must of necessity be based on circumstantial
 evidence. Among the [non-exclusive] circumstances which
 may be considered are the following: (1) the extent of
 exposure to the disease or disease-causing agents during
 employment, (2) the extent of exposure outside
 employment, and (3) absence of the disease prior to the
 work-related exposure as shown by the employee’s medical
 history.

Booker, 297 N.C. at 476, 256 S.E.2d at 200 (citations omitted) (emphasis added).

 Only after a plaintiff has proven that the plaintiff’s occupational disease is

compensable, must the plaintiff prove a defendant-employer’s liability—by proving

the plaintiff was “last injuriously exposed” to the hazards of the disease while working

for that defendant-employer. N.C.G.S. § 97-57. N.C.G.S. § 97-57 states in part:

 In any case where compensation is payable for an
 occupational disease,[14] the employer in whose

 14 I.e., once the plaintiff has proven a compensable occupational disease.

 - 31 -
 HINSON V. CONT’L TIRE THE AMS.
 Opinion of the Court

 employment the employee was last injuriously exposed to
 the hazards of such disease . . . shall be liable.

 For the purpose of this section when an employee has been
 exposed to the hazards of asbestosis . . . for as much as 30
 working days, or parts thereof, within seven consecutive
 calendar months, such exposure shall be deemed injurious
 but any less exposure shall not be deemed injurious[.]

N.C.G.S. § 97-57 (emphasis added). If a plaintiff fails to prove that the plaintiff has

a compensable occupational disease, compensation will be denied and “last injurious

exposure” analysis pursuant to N.C.G.S. § 97-57 will not be necessary. N.C.G.S. § 97-

57 is not meant to establish the burden for proving a causal relationship between a

particular employment and development of an occupational disease. Instead:

 [T]he purpose of the “last injurious exposure” doctrine is
 “to eliminate the need for complex and expensive litigation
 of the issue of relative contribution by each of several
 employments to a plaintiff’s occupational disease.” The
 doctrine provides a plaintiff with a reduced burden by
 requiring only a showing that the occupational exposure
 augmented a disease, “however slight[,]” as opposed to
 demonstrating how much each exposure resulted in the
 disease.

Penegar, __ N.C. App. at __, 815 S.E.2d at 398 (citations omitted). In the present

cases, Plaintiffs alleged their sole occupational exposure to asbestos occurred working

in the factory.

 C. The “Bellwether Cases” Approach

 As noted above, in the ordinary case—because it is the plaintiffs’ burden to

prove they “suffer[ed] from [] compensable occupational disease[s,]” Hardin, 136 N.C.

 - 32 -
 HINSON V. CONT’L TIRE THE AMS.
 Opinion of the Court

App. at 354, 524 S.E.2d at 371 (citations omitted)—the Commission would first

determine whether the plaintiffs had met their burden of proving they suffered from

an occupational disease. If the plaintiffs failed to meet that burden, the Commission

could deny their claims without making any further determinations such as

compensability and liability. See, e.g., Payne v. Charlotte Heating & Air

Conditioning, 172 N.C. App. 496, 616 S.E.2d 356 (2005); Clark v. ITT Grinnell Ind.

Piping, Inc., 141 N.C. App. 417, 539 S.E.2d 369 (2000).

 However, because of the bellwether cases approach, the Commission addressed

the issues common to all Consolidated Plaintiffs first—and only then made individual

determinations specific to the individual Bellwether Plaintiffs. The Commission’s

determinations concerning whether any individual Consolidated Plaintiff had

asbestosis will necessarily require review of the medical evidence specifically relevant

to that particular Plaintiff—i.e., thorough review of all relevant documentary and

testimonial evidence for every one of the 144 Consolidated Plaintiffs. Pursuant to the

bellwether cases approach, review of the medical evidence for the alleged asbestos-

related diseases for all Consolidated Plaintiffs will only be necessary if Plaintiffs first

prove that working in the factory exposed them to asbestos, in a form and in

quantities, that could have caused the alleged asbestosis; or caused—or significantly

contributed to—the development of other alleged asbestos-related diseases.

 The Commission determined employment in the factory did not expose

Plaintiffs to airborne asbestos of a kind and in amounts sufficient to cause or

 - 33 -
 HINSON V. CONT’L TIRE THE AMS.
 Opinion of the Court

contribute to asbestosis.15 If this determination is affirmed, most, if not all, of the

Consolidated Plaintiffs’ asbestosis claims can be decided without the time and cost

involved in conducting full hearings for all 144 cases. Booker, 297 N.C. at 472, 256

S.E.2d at 198. In light of the inverted approach applied in the bellwether cases, the

Commission essentially assumed, arguendo, that the Consolidated Plaintiffs actually

had asbestosis that resulted in disablement or death—and focused solely on whether

Plaintiffs proved work at the factory was a significant causal factor in development

of the alleged asbestosis. The Commission has not, of course, made this

determination16—but will do so if required by this Court’s resolution of the bellwether

cases and factual circumstances particular to the remaining Consolidated Plaintiffs.

The Commission also determined that, with respect to employment at the factory,

neither colon cancer nor tonsil cancer were occupational diseases pursuant to

N.C.G.S. § 97-53(13).

 D. The Bellwether Plaintiffs’ Claims

 Plaintiffs and Defendant presented weeks of expert testimony concerning the

common issue of whether Plaintiffs could have been subjected to sufficient airborne

asbestos—chrysotile or amphibole—while working at the factory to cause

compensable asbestosis. James, 160 N.C. App. at 562, 586 S.E.2d at 560. Evidence

 15 I.e., that any alleged asbestos-related disease could not have “arisen out of” employment
with Defendant. Gallimore, 292 N.C. at 402–03, 233 S.E.2d at 531–32; N.C.G.S. § 97-54.
 16 Except for the five Bellwether Plaintiffs currently before us. Because these five cases were

actually tried, the Commission considered the evidence relevant to the “common issues,” as well as the
evidence uniquely relevant to each individual Bellwether Plaintiff.

 - 34 -
 HINSON V. CONT’L TIRE THE AMS.
 Opinion of the Court

was also presented for Bellwether Plaintiffs’ individual claims, including evidence

related to whether Bellwether Plaintiffs had the diseases alleged. Based upon this

testimony, deposition testimony, and the exhibits tendered, the Commission

determined that Plaintiffs failed to meet their burdens on all accounts.

 IV. Plaintiffs’ Common Issues Arguments

 Plaintiffs did not brief the common issues separately from the individual

issues, so we look to Bellwether Plaintiffs’ individual briefs for the common issues

arguments. Because our analysis pertaining to the common issues will apply to the

claims of all Consolidated Plaintiffs—not just Plaintiff Hinson or the other Bellwether

Plaintiffs—where Plaintiff Hinson’s brief refers to “Plaintiff,” we will substitute

“Plaintiffs” or “Consolidated Plaintiffs,” which will refer to all Consolidated Plaintiffs.

 Generally, Plaintiffs argue: (A) The Commission did not apply the appropriate

burden of proof in reaching its determinations concerning Plaintiffs’ exposure to

asbestos as employees in the factory; (B) the Commission relied on incompetent

evidence in reaching its conclusions; (C) certain of the findings of fact were not

supported by sufficient competent evidence; and (D) the ultimate findings/conclusions

of law are incorrect.

 A. Burden of Proof

 Plaintiffs first argue that the Commission “placed an impermissible burden of

establishing the amount of exposure to asbestos” on Plaintiffs. We disagree.

 - 35 -
 HINSON V. CONT’L TIRE THE AMS.
 Opinion of the Court

 As a general matter: “The employee seeking workers’ compensation benefits

bears the burden of proving every element of compensability. The degree of proof

required of a claimant under the Act is the ‘greater weight’ or ‘preponderance’ of the

evidence.” Hardin, 136 N.C. App. at 354, 524 S.E.2d at 371 (citations omitted).

Plaintiffs specifically argue:

 One of the critical issues in the [consolidated cases] was
 whether Plaintiff[s] [were] exposed to asbestos and
 whether such exposure was medically capable of causing a
 disease. . . . .

 [The] Commission made findings and conclusions
 regarding the amount of exposure [] Plaintiff[s] had to
 asbestos and whether that level was sufficient to cause a
 disease.

 The Commission specifically, and repeatedly, [determined]
 that [Plaintiffs] “[were] not exposed to asbestos in such
 form and quantity, and used with such frequency, as to
 cause asbestosis or any asbestos-related condition.” What
 the . . . Commission . . . did was place the burden on []
 [Plaintiffs] to establish the level of exposure to [asbestos].
 Under North Carolina law, that is impermissible.

 We first note that Plaintiffs’ counsel acknowledged during the hearings that

Plaintiffs’ burden was to prove “what [Plaintiffs’] actual exposures were” to asbestos

“[a]t the plant.” In addition, Plaintiffs have not challenged finding of fact 2, which

states in part: “Plaintiffs allege that they were exposed to asbestos [while working in

the factory] in such form and quantity and with such frequency that it caused

asbestosis.” As we must take this unchallenged finding as correct, Plaintiffs now

challenge the application of a standard they approved while arguing before the

 - 36 -
 HINSON V. CONT’L TIRE THE AMS.
 Opinion of the Court

Commission. Nonetheless, Plaintiffs contend that the Commission erroneously

applied the following burden of proof contained in N.C.G.S. § 97-53—and that by so

doing, the Commission imposed upon Plaintiffs the impermissible burden of

“establish[ing] the[ir] level[s] of exposure” to asbestos. N.C.G.S. § 97-53 contains

different requirements depending on the type of injury alleged, including the

following:

 Occupational diseases caused by chemicals shall be
 deemed to be due to exposure of an employee to the
 chemicals herein mentioned only when as a part of the
 employment such employee is exposed to such chemicals in
 such form and quantity, and used with such frequency as
 to cause the occupational disease mentioned in connection
 with such chemicals.

N.C.G.S. § 97-53. Defendant’s counsel referred to this section of N.C.G.S. § 97-53 in

the opening statement to the deputy commissioner, and Plaintiffs did not object. On

appeal, Plaintiffs do not specifically challenge the applicability of this part of N.C.G.S.

§ 97-53 to cases involving exposure to asbestos—but do state that “this language

speaks of ‘chemicals’ and not necessarily asbestos. There was no testimony or

evidence that asbestos would be considered a ‘chemical’ under the statute.” Plaintiffs

further contend: “Regardless, this statute, as applied by the Commission, would be in

 - 37 -
 HINSON V. CONT’L TIRE THE AMS.
 Opinion of the Court

direct conflict with . . . case law whereby [employees were] not required to establish

the amount of exposure.”17

 We note that this part of N.C.G.S. § 97-53, by its plain language, only applies

to “[o]ccupational diseases caused by chemicals” “herein mentioned[,]” and only to

“occupational disease[s] mentioned in connection with such chemicals.” N.C.G.S. §

97-53. Even assuming that asbestos would be considered a “chemical” for the

purposes of this section, asbestos is not “mentioned” in N.C.G.S. § 97-53, and

asbestosis is not “mentioned in connection with” asbestos, or any other “chemical.”

Id.; cf., e.g. N.C.G.S. § 97-53(24) and (12) (compare “[a]sbestosis” to “[p]oisoning by

benzol, or by nitro and amido derivatives of benzol”).

 However, the Commission did include language that tracks the language of

this part of N.C.G.S. § 97-53 in five of its ultimate findings. For example, finding 45

states in part: “The greater weight of the evidence in view of the entire record does

not show that [P]laintiffs, through their employment at [the] factory, were exposed to

asbestos in such form and quantity and [] with such frequency as to cause or

significantly contribute to the development of asbestosis[.]” (Emphasis added). The

italicized portion of this ultimate finding tracks the language of N.C.G.S. § 97-53.

 17While this Court is generally bound by its prior decisions interpreting a statute, In re Civil
Penalty, 324 N.C. 373, 384, 379 S.E.2d 30, 37 (1989), no such interpretation of this part of N.C.G.S. §
97-53 has occurred. Since there are no appellate opinions interpreting N.C.G.S. § 97-53 in the manner
suggested by Plaintiffs, this Court is bound by the language of the statute itself, not the principles of
law discussed in the two cases cited by Plaintiffs—one of which is unpublished—that do not address
this provision.

 - 38 -
 HINSON V. CONT’L TIRE THE AMS.
 Opinion of the Court

However, though the underlined portion is not found in N.C.G.S. § 97-53, it does

correspond with the correct burden for proving a causal connection between a

particular employment and alleged asbestosis. “Asbestosis may be [a compensable]

occupational disease provided that the worker’s exposure to . . . [asbestos]

‘significantly contributed to, or was a significant causal factor in,’ the development of

the disease.” Patton v. Sears Roebuck & Co., 239 N.C. App. 370, 375, 768 S.E.2d 351,

355 (2015) (citations omitted) (emphasis added).

 As discussed below, we find that the burden applied by the Commission was a

correct application of the law to the facts of the consolidated cases. The testimony of

both Plaintiffs’ and Defendant’s experts included opinions that support the

Commission’s focus on “exposure to airborne asbestos,” “in such form,” in sufficient

“quantity,” and “with such frequency”—i.e. recurring exposures over time, or duration

of exposure—in making its determination of whether Plaintiffs had met their burden

of proving a causal connection between their alleged asbestosis and their work at the

factory. These categories conform with factors enumerated by the NCI concerning

elevated risk for asbestos-related diseases: “Dose (how much asbestos an individual

was exposed to)[; d]uration (how long an individual was exposed)[; and s]ize, shape,

and chemical makeup of the asbestos fibers.” NCI Fact Sheet at 2-3 (citations

omitted). They also conform to one of the non-exclusive circumstantial factors

appropriate for consideration in determining whether a plaintiff has met the burden

of proving a causal relationship: “[T]he extent of exposure to the disease or disease-

 - 39 -
 HINSON V. CONT’L TIRE THE AMS.
 Opinion of the Court

causing agents during employment[.]” Booker, 297 N.C. at 476, 256 S.E.2d at 200

(citations omitted). Therefore, consideration of these factors was appropriate in

determining whether asbestos exposure at the factory “‘was a significant causal factor

in,’ the development of” Plaintiffs’ alleged asbestosis. Id. (citations omitted).

 1. “Form” of Asbestos

 As recognized by the NCI, the “size, shape, and chemical makeup of the

asbestos fibers” are relevant in determining the likelihood exposure will result in

disease. NCI Fact Sheet at 2-3 (citations omitted). Plaintiffs’ “expert in electron

microscopy and lung tissue analysis,” Mark Wilson Rigler, PhD (“Rigler”),18 agreed

with the NCI Fact Sheet that “asbestiform minerals come in a couple of different

broad classes”—“serpentine,” which “is mainly comprised of chrysotile” asbestos and

is “like a tube[,]” and “amphibole,” which is “mainly composed of blocky structural

forms.” Rigler clarified that only when these minerals are in fiber form are they

capable of causing disease. Rigler testified that “probably ninety-five percent of the

products [] manufactured, at least in America, had chrysotile asbestos[,]” “and the

other five percent would’ve probably had amosite [an amphibole form], and that

might’ve been pipe coverings, that kind of thing.”

 Rigler further testified that the human body handles chrysotile asbestos

differently than amphibole asbestos:

 18 Because Plaintiffs argue on appeal that only medical experts are qualified to give certain
causation opinion testimony, in order to avoid confusion concerning which experts were medical
doctors and which were PhDs, we will only use the honorific “Dr.” when referring to medical doctors.

 - 40 -
 HINSON V. CONT’L TIRE THE AMS.
 Opinion of the Court

 Chrysotile asbestos, which is the tubular type that we
 talked [about] earlier, . . . is not retained as long as the
 amphibole fibers are, so if you get chrysotile in the lung, it
 tends to move that out a bit quicker. Some of the
 [chrysotile] fibers are smaller. They are taken up a little
 bit easier into macrophages. . . . . So . . . then they try to
 move out, if they can, through your lymphatic circulation.
 Some are removed out through the blood stream, but they
 do . . . migrate in the body. Now, the amphibole types of
 asbestos, they tend not to migrate like that. They tend to
 stay in the body for 45 [years], so you can, you know, after
 ten, twenty, thirty years, you can see amphibole asbestos
 in the body.

Defendant’s expert, Dr. Victor Roggli (“Dr. Roggli”), testified that chrysotile asbestos

fibers cleared from the body much more rapidly than amphibole fibers. Plaintiffs’

expert industrial hygienist, William M. Ewing (“Ewing”), agreed that amosite

asbestos is “recognized as being more potent when it comes to cancer and exposure”

than chrysotile asbestos, but testified that he did not know if “there is a general

understanding among [other] industrial hygienists . . . that chrysotile is less potent

with respect to asbestosis as well[.]” Dr. Roggli testified that exposure to commercial

amphibole fibers can cause disease at a lower dosage than other asbestos fibers, such

as chrysotile. He stated the difference was very significant for lung cancer, and that

“it’s believed” by many experts that someone would require a greater exposure to

“chrysotile to get to asbestosis than for commercial amphiboles.” Dr. Roggli testified

that chrysotile asbestos fibers do not “form asbestos bodies as well” as amphibole

asbestos fibers, and that “it really takes huge amounts of exposure to chrysotile to get

asbestosis.” Dr. Thomas Sporn (“Dr. Sporn”) testified: “In general my opinions have

 - 41 -
 HINSON V. CONT’L TIRE THE AMS.
 Opinion of the Court

been that exposure [to] chrysotile containing end products [commercial products such

as insulation, gaskets, or brakes] do not particularly cause . . . asbestosis[.]”19

 According to Dr. Roggli, asbestos fibers less than five microns in length “would

not be disease-producing[,]” and that approximately ninety percent of the scientific

community was of the same opinion. In prior testimony, Rigler also defined “larger

structures” indicative of occupational exposure as “greater than five microns.” Dr.

Roggli testified that chrysotile fibers of over five microns are rarely found in lungs—

estimating that only about ten percent of chrysotile lung exposures include fibers

longer than five microns. Rigler testified that “asbestos bodies” are created when

tissue forms around an asbestos fiber, and they can be indicators of asbestosis.

Defendant’s expert, Dr. Timothy David Oury (“Dr. Oury”), testified: “without asbestos

bodies, [you cannot] make the pathological diagnosis for asbestosis[.]” Because of its

generally smaller size, and the rapidity with which the human body evacuates it, Dr.

Roggli testified that “of the asbestos types,” chrysotile is “the least effective at forming

asbestos bodies.”

 Dr. Roggli’s expert medical opinion was that “short fibers of chrysotile[20 are]

more consistent with a background environmental exposure than a long fiber would

be[.]” Dr. Roggli testified that short chrysotile fibers are commonly found in water

supplies and products such as beer, wine, soft-drinks, and ketchup. Rigler testified

 19 Assuming the product contained only chrysotile asbestos.
 20 Less than five microns.

 - 42 -
 HINSON V. CONT’L TIRE THE AMS.
 Opinion of the Court

that multiple governmental and science agencies required that a suspected asbestos

fiber had to be at least five microns in length “in order to be counted as a fiber” for

purposes of determining asbestos exposure—but stated that he disagreed with this

requirement.21 Rigler testified that a relatively small amount of short chrysotile

fibers found in lung tissue would suggest a very significant prior exposure to

chrysotile. Rigler saw no contradiction between his testimony in the present cases

and testimony he had given in prior cases that “‘[t]ypically [a]n occupational exposure

will be indicated by longer fibril structures.’” “‘As far as the length of structures, you

will not normally see [fibers longer than five microns] in non-occupational exposure.

You may see some much, much smaller structures. That’s typically what you see in

environmental type exposure.’”

 Dr. Roggli testified in response to the idea that finding short chrysotile

asbestos fibers in lung tissue was indicative of a substantial prior occupational

exposure to chrysotile asbestos with the following: “Well, if that’s the case, it means

everybody in the general population has had a huge exposure to chrysotile in the past

because that’s exactly what you find in lung tissue from the people from the general

population—is a number of short chrysotile fibers.”

 The Commission found as fact: “Chrysotile is a type of asbestos, often shorter

than five micro[ns], that is particularly susceptible to being broken down quickly in

 21 There are also minimum width requirements, and the structure must also “have an aspect
ratio of three . . . to one.”

 - 43 -
 HINSON V. CONT’L TIRE THE AMS.
 Opinion of the Court

acidic environments, such as a human lung.” “Fibers shorter than 5 micro[ns], due

to their length, are cleared quickly by the lungs and are not believed to contribute to

[asbestosis].” “Many experts believe that chrysotile asbestos does not cause or

contribute to asbestosis or asbestos-related disease due to its short clearance half-life

and the fact that persistence of a fiber within the lung is a crucial determinant of its

pathogenicity.” There was plenary evidence from which the Commission could

determine that the “form” of the asbestos that Plaintiffs alleged they were exposed to

at the factory was a relevant factor in determining whether Plaintiffs’ alleged

asbestos exposure at the factory could have caused asbestosis.

 2. Quantity

 The quantity, or amount of asbestos exposure, was central to the Commission’s

determination. The NCI refers to this as the “dose,” “how much asbestos an

individual was exposed to[,]” and considers it an important factor to consider. NCI

Fact Sheet at 3 (citations omitted). There are two general ways in which the amount

of exposure impacts the Commission’s causation analysis: (1) Was the exposure

sufficient to be a “significant causal factor” in the development of Plaintiffs’ alleged

asbestosis; and (2) was the exposure “significantly greater” than the background

environmental exposure.22 “[T]he ‘causative danger must be peculiar to the work and

 22 “Significant means ‘having or likely to have influence or effect: deserving to be considered:
important, weighty, notable.’ Significant is to be contrasted with negligible, unimportant, present but
not worthy of note, miniscule, or of little moment.” Rutledge, 308 N.C. at 101–02, 301 S.E.2d at 370
(citation omitted). Proving what constituted exposure “significantly greater” than environmental

 - 44 -
 HINSON V. CONT’L TIRE THE AMS.
 Opinion of the Court

not common to the neighborhood.’” Culpepper, 93 N.C. App. at 248, 377 S.E.2d at 781

(citation omitted). If the answer to either of these questions was “no,” then any

alleged asbestos-related diseases could not be causally linked to work at the factory.

 Rigler testified that at his laboratory, in order to estimate the amount of

exposure, they conduct a fiber analysis using “grid counting”; “we’ll count the number

of asbestos [fibers].” According to Rigler, grid counting is “standard protocol.” Rigler

testified that he would first use an electron microscope to count “what we call large

fiber structures, ones that are larger than five microns or so.” Then Rigler increases

magnification to the extent that he can count asbestos fibers “a half micron in size

and up.” An estimated number of fibers per gram of lung tissue is extrapolated from

the number of fibers actually detected in a smaller amount of tissue.

 Although Rigler testified that he believed “background” exposure levels should

be zero, he testified in 2000 that, based on his own research and the relevant

literature, the environmental background range he had seen had “‘been upwards of

two hundred and fifty thousand [asbestos fibers] [per gram of lung tissue].

Sometimes, again, it depends on the literature that you look at—half a million

structures.’” Rigler admitted that he used to compare the number of structures per

gram against a cohort, or control group, developed from examining lung tissue of

people with no reported occupational asbestos exposure. The range of structures per

exposure for these cases was Plaintiffs’ burden, and a determination that could only be made by the
Commission—absent consensus between the parties.

 - 45 -
 HINSON V. CONT’L TIRE THE AMS.
 Opinion of the Court

gram determined from the cohort constituted the range of non-occupational

background environmental asbestos exposure of the general population. Rigler

stopped comparing tissue samples examined in his lab against a cohort before his

examination of Plaintiff Jones’23 lung tissue sample, which Rigler opined showed

asbestosis. Dr. Roggli testified that the number of structures counted is meaningless

without a proper cohort to compare that number to.

 The deputy commissioner questioned the basis of Rigler’s opinion that any

amount of asbestos fibers found in lung tissue would be indicative of occupational

exposure, and Rigler’s opinion that the amount of asbestos found in Plaintiff Jones’

tissue indicated asbestosis:

 THE COURT: The [Plaintiffs] I’m looking at are from
 Charlotte, . . . which is a major metropolitan area[.] So I
 would assume that you would expect that some people
 within the Charlotte area, who’ve never had an
 occupational history, would have some asbestos in their
 lungs.

 [RIGLER]: I don’t know.

 THE COURT: Don’t know. Wow.

Rigler then testified: “I think that you’re going to see a lot of variation [in background

level] depending upon where these people lived. It’s always going to be dependent

upon what they did and where they lived.” Plaintiffs’ expert, Dr. David A. Schwartz,

 23 One of the deceased Consolidated Plaintiffs whose lung tissue was examined.

 - 46 -
 HINSON V. CONT’L TIRE THE AMS.
 Opinion of the Court

testified “I don’t think people in the general public are at risk of developing asbestosis

based on their exposures to environmental concentrations of asbestos.”

 Dr. Roggli testified: “The analysis that we did did not demonstrate that

[Plaintiff Jones] was exposed to asbestos greater than that of [the] general

population.” Dr. Roggli explained that the types of employment that could expose a

worker to the levels of chrysotile asbestos required to cause asbestosis were those jobs

where employees were working directly with the asbestos, such as “insulators,”

“shipyard workers,” and specialized work within other industries, but he could not

remember ever diagnosing a tire factory employee with asbestosis.

 Therefore, there was evidence presented that most of the asbestos used in the

factory was chrysotile, and that Plaintiffs would have had to have been exposed to

“huge amounts” of it to develop asbestosis. Based on the evidence, the Commission

needed to determine whether working at the factory exposed Plaintiffs to “quantities”

of asbestos fibers sufficient to cause asbestosis, and whether working at the factory

exposed Plaintiffs to quantities of asbestos “significantly” greater than the

background levels to which the general public were exposed.

 3. Frequency

 Plaintiffs’ experts and Defendant’s experts disagreed concerning the likelihood

that episodic exposures to elevated levels of asbestos were likely to cause asbestosis.

The Commission found: “Asbestos-related diseases follow a dose-response

relationship—the higher the cumulative exposure dose, the greater the risk of

 - 47 -
 HINSON V. CONT’L TIRE THE AMS.
 Opinion of the Court

disease, with asbestosis generally requiring the highest dose.” The NCI Fact Sheet

included “duration”—“how long an individual was exposed” to airborne asbestos

fibers—as one of the factors to consider when evaluating the risks of developing

asbestos-related diseases. NCI Fact Sheet at 3 (citations omitted). It is the position

of the NCI that though “it is clear that the health risks from asbestos exposure

increase with heavier exposure and longer exposure times, investigators have found

asbestos-related diseases in individuals with only brief exposures.” Id. It was the

province of the Commission to determine from the record evidence if Plaintiffs had

met their burden of proving sufficient frequency of exposure—whether by proving

large, intermittent exposures, or lesser but more continuous exposures.

 Plaintiffs’ expert, Ewing, testified concerning the relationship between

“quantity,” “frequency,” and duration of asbestos exposure: “You would like to have

exposure information [quantity], duration information, how long is that exposure

going on, and then frequency information, so you’d like to have those three pieces of

data. If you have that, then you can do some calculations that can give you a person’s

dose.” Ewing agreed that for the Bellwether Plaintiffs, “at most, their exposures were

episodic[.]” Defendant’s expert, Dr. Andrew J. Ghio (“Dr. Ghio”), testified that, in his

expert medical opinion, he did not believe “an individual working at [the factory]

[wa]s at increased risk for asbestosis.” The Commission noted: “Dr. Roggli testified

that there was not sufficient exposure to asbestos at the factory in question to

contribute to or to cause an asbestos-related disease for Mr. Jones or anyone in his

 - 48 -
 HINSON V. CONT’L TIRE THE AMS.
 Opinion of the Court

position.” Drs. Ghio and Roggli were both of the opinion that Plaintiffs would have

only endured minor, infrequent episodic exposures to airborne asbestos fibers, and

these minor episodic exposures would not have been significant enough to increase

Plaintiffs’ risks of developing asbestos-related diseases. The Commission did not err

in considering the “frequency” of Plaintiffs’ exposure to airborne asbestos fibers.

 4. Last Injurious Exposure

 Plaintiffs make no arguments on appeal concerning the liability

determinations made by the Commission pursuant to N.C.G.S. § 97-57. Therefore,

any such arguments are deemed abandoned. Although, as discussed above, the

Commission was not required to make any determination pursuant to N.C.G.S. § 97-

57—once it determined that Plaintiffs had failed to prove their alleged asbestosis

arose out of their employment, and was therefore not compensable—the Commission

did make this determination in its ultimate findings 16, 19, 21, 23, 43 and 45.

 For example, in ultimate finding 43 the Commission determined that Plaintiffs

had not been “exposed to the hazards of asbestosis through [their] employment with

[D]efendant for 30 days or parts thereof within a seven-month consecutive period

which proximately augmented the disease process of asbestosis to the slightest

degree.” That unchallenged determination relieved Defendant of any liability for

Plaintiffs’ alleged asbestosis—even assuming, arguendo, that all Plaintiffs had

asbestosis, and that their asbestosis was compensable. This is because the “last

injurious exposure” analysis is only concerned with which employer—or insurance

 - 49 -
 HINSON V. CONT’L TIRE THE AMS.
 Opinion of the Court

company—will be held liable for a proven compensable occupational disease. See

Penegar, __ N.C. App. at __, 815 S.E.2d at 398.

 5. Conclusion

 It was the province of the Commission to decide, based on competent evidence,

what factors Plaintiffs needed to prove in order to meet the burden of proving asbestos

exposure at the factory was a significant causal factor in the development of their

alleged asbestosis. Based on the evidence presented, the “form” of the asbestos, and

the “quantity” and “frequency” of exposure, were legitimate considerations in making

this determination. Therefore, the Commission’s ultimate findings that state “[t]he

greater weight of the evidence in view of the entire record shows that [P]laintiffs were

[not] exposed to airborne asbestos . . . in such form and quantity and with such

frequency as to cause . . . asbestosis” do not show that the Commission “placed an

impermissible burden” on Plaintiffs.

 In addition, the Commission also made the following ultimate finding in

finding 43:

 Given the evidence of air contaminant measurements
 taken at [the] factory, the pathology evidence collected
 from workers’ lungs, and the scientific and epidemiological
 literature presented on the subject, the greater weight of
 the evidence in view of the entire record does not
 demonstrate a causal connection between asbestosis and
 employment at the . . . factory.

This ultimate finding—which determined Plaintiffs failed to prove the required

causal connection, Patton, 239 N.C. App. at 375, 768 S.E.2d at 355, and other

 - 50 -
 HINSON V. CONT’L TIRE THE AMS.
 Opinion of the Court

authority cited—does not contain the language to which Plaintiffs object. Finally, the

Commission’s unchallenged determinations pursuant to N.C.G.S. § 97-57 serve to

relieve Defendant from any liability for Consolidated Plaintiffs’ alleged compensable

asbestosis. This argument is without merit.

 B. Competent Evidence

 We have held that Defendant cannot be held liable for Plaintiffs’ alleged

asbestosis, even were it compensable, due to the Commission’s unchallenged N.C.G.S.

§ 97-57 determinations. However, in light of the number of Consolidated Plaintiffs

impacted by this opinion, we address Plaintiffs’ remaining arguments. Plaintiffs

primarily argue that certain evidence relied upon by the Commission was not

competent. However, as this Court has stated:

 Although [Plaintiffs] point[] to . . . evidence which [they]
 feel[] was incompetent to support [some of] the
 . . . Commission’s findings of fact, we find it unnecessary to
 decide those points of contention in light of the rule that
 findings of fact which are supported by competent evidence
 are conclusive on appeal, even though other incompetent
 evidence may have been improperly admitted.

Kennedy, 101 N.C. App. at 33, 398 S.E.2d at 682 (citation omitted) (emphasis added).

Therefore, even assuming, arguendo, the Commission relied upon some incompetent

evidence, our review is limited to whether the competent evidence was sufficient to

 - 51 -
 HINSON V. CONT’L TIRE THE AMS.
 Opinion of the Court

support the Commission’s findings of fact—including its ultimate findings—and

whether the findings support its conclusions and rulings.24 Id.

 Plaintiffs’ arguments fall into the following general categories: (1) The “air

sampling” evidence and the “fiber year theory”; (2) reliance on “non-medical” expert

testimony; (3) reliance on the lung pathology from the five deceased Plaintiffs; and

(4) the Commission’s reliance on the above allegedly incompetent evidence in support

of its ultimate findings and conclusions.

 1. Air Sampling and Fiber Year Theory

 Plaintiffs argue that “the Commission erred in relying on the ‘fiber year

theory’” and air sampling to determine that Plaintiffs were not exposed to sufficient

amounts of airborne asbestos at the factory to cause asbestosis. We disagree.

 Specifically, Plaintiffs argue that the “Commission never stated what level of

exposure was necessary to cause a disease except to subscribe to [D]efendant’s usage

of the ‘fiber year theory.’” Plaintiffs further argue that Defendant “could not prove

the amount of [Plaintiffs’] exposure to asbestos and could only provide a very broad

guess at the level necessary to cause a disease.” Plaintiffs also argue that the

Commission ignored the fact that incidents of airborne asbestos being released in the

factory were “occasional,” not constant, and, therefore, “no one knows how much

 24 Plaintiffs did not seek to suppress the evidence they now challenge on appeal—either prior
to or during the hearings. Although hearings before the Commission are quasi-judicial, this Court has
applied N.C.G.S. § 8C–1, Rule 702 in its review of workers’ compensation claims. Wise v. Alcoa, Inc.,
231 N.C. App. 159, 752 S.E.2d 172 (2013).

 - 52 -
 HINSON V. CONT’L TIRE THE AMS.
 Opinion of the Court

asbestos was being damaged on any particular day. No one knows how much asbestos

was inhaled by [Plaintiffs]. The only evidence of the levels of the asbestos in the air

was from air sampling done in the facility.”

 Plaintiffs may be correct that “[n]o one knows how much asbestos was inhaled

by” Plaintiffs, but it was Plaintiffs’ burden to prove that their alleged exposure to

asbestos fibers at the factory caused or significantly contributed to their alleged

asbestos-related diseases. The fact the Commission did not include findings of fact

related to all the evidence that Plaintiffs believe supported their claims does not mean

the Commission ignored this evidence. “[T]he Commission does not have to explain

its findings of fact by attempting to distinguish which evidence or witnesses it finds

credible.” Deese v. Champion Int’l Corp., 352 N.C. 109, 116, 530 S.E.2d 549, 553

(2000) (citation omitted). “Requiring the Commission to explain its credibility

determinations . . . would be inconsistent with our legal system’s tradition of not

requiring the fact finder to explain why he or she believes one witness over another

or believes one piece of evidence is more credible than another.” Id. at 116-17, 530

S.E.2d at 553. Further, the Commission stated that it had “reviewed and considered

all hearing and deposition transcripts, along with all evidentiary exhibits,

arguments, and briefs in reaching a decision[.]” The opinion and award contains over

25 pages devoted to listing the transcripts, depositions, and exhibits considered by

the Commission. The Commission also stated multiple times throughout the opinion

 - 53 -
 HINSON V. CONT’L TIRE THE AMS.
 Opinion of the Court

and award that its determinations were based upon the “greater weight of the

evidence in view of the entire record[.]”

 Plaintiffs continue: “Yet the Commission found that [Plaintiffs were] not

exposed to . . . levels” of asbestos sufficient to cause asbestosis. Plaintiffs again

suggest that it was Defendant’s burden to disprove Plaintiffs’ claims when it was

Plaintiffs’ burden to prove all the elements necessary to show compensable asbestos-

related diseases. Further, Plaintiffs did not direct this Court to any part of the

Commission’s opinion and award in which the Commission “found that [Plaintiffs

were] not exposed to” sufficient “fiber years” of asbestos to cause asbestosis. This is

because “fiber years” are not discussed in the opinion and award. There is no evidence

that the Commission subscribed to the fiber year theory, or relied on it when making

its relevant findings and conclusions.

 Plaintiffs argue: “There was no evidence introduced by [D]efendant to establish

whether [P]laintiffs’ exposure was consistent with the background level of the

[factory]. There was no evidence introduced showing the levels of exposure when

[P]laintiff[s] w[ere] damaging insulation, using compressed air on damaged

insulation or cutting asbestos gaskets.” It was Plaintiffs’ burden to introduce this

evidence, and Defendant had no burden to convince the Commission that Plaintiffs’

alleged injuries did not arise in the course of employment at the factory.

 Although Plaintiffs presented evidence to the contrary, there was plenary

evidence—including evidence unrelated to air sampling or the fiber year theory—to

 - 54 -
 HINSON V. CONT’L TIRE THE AMS.
 Opinion of the Court

support the Commission’s ultimate finding that Plaintiffs were not—due to their

work at the factory—exposed to asbestos sufficient to cause asbestosis. For example,

Dr. Ghio testified as follows:

 [DR. GHIO]: Again, the only [air sampling] levels that I’m
 aware of are those taken during the health hazard
 evaluation done by NIOSH in their review of the plants
 across the Midwest[.] . . . . And the ones that [Defendant’s
 attorneys] forwarded to me regarding [the factory]. This is
 outside of my expertise though. I’m not an industrial
 hygienist. I’m a pulmonologist.

 ....

 Q. Sir, do you think it’s proper for you to make an
 attribution of cause and effect when you acknowledge that
 you’re unaware of any of the exposure levels for disease in
 the tire industries?

 A. I’m aware of the levels at [the factory]. They were
 forwarded to me. Regarding a more global approach to that
 question, you know, can a physician be called upon to make
 a diagnosis of asbestosis without being aware of the actual
 dust levels in the environment, and it’s very rare that, as
 pulmonologists . . . we’re made [aware of] those values. We
 make diagnoses all the time of asbestosis. 99 percent of all
 diagnoses of asbestos[is] are made without any awareness
 of such levels. Dr. Ohar and Dr. Schwartz [Plaintiffs’
 medical experts] were unaware of levels when they
 diagnosed these patients to have asbestosis.

Dr. Ghio’s testimony shows he was not, to any significant degree, “relying on the ‘fiber

year theory’” or the air sampling in order to reach his conclusions. Further, as noted

in finding of fact 38: “Dr. Roggli testified that there was not sufficient exposure to

asbestos at the factory in question to contribute to or to cause an asbestos-related

 - 55 -
 HINSON V. CONT’L TIRE THE AMS.
 Opinion of the Court

disease for Mr. Jones or anyone in his position.” This opinion was not based air

sampling from the factory.

 Dr. Ghio also testified: “[Asbestos] was simply there [in the factory], and by

being there, [Plaintiffs] misinterpret that to [mean] that they’re at increased risk.

They’re aware that piping in [the factory] had asbestos, and they have—they have

the misconception that that increases their risk for asbestosis, and it does not.”

Plaintiff’s expert, Ewing, agreed with Dr. Ghio in this regard, stating: “I’m not of the

opinion that because pipe insulation is present there must be exposure. There has to

be work going on on the pipe insulation or some disturbance of that material for the

exposure to arise.” In forming his opinions, Dr. Ghio relied heavily on Plaintiffs’

patient histories, and review of their x-rays:

 [PLAINTIFFS’ COUNSEL:] Dr., with respect to exposure
 history, you’ve testified in the past, have you not, that you
 put more emphasis on what the patient says than you do
 actually specific [airborne] fiber levels, sir. Do you
 remember that testimony?

 A. I do. I follow the ATS [(“American Thoracic Society”)]
 criteria which is—I base my diagnosis whenever possible
 on an accurate occupation history.

 Q. All right. So in the case of [Plaintiffs], you really never
 looked at what the industrial hygiene reported as to what
 the individual exposures were or the sampling was. Is that
 not true, sir?

 A. I have been provided actual values of fiber
 measurements, and actual fiber values of fiber
 measurements were in agreement with the histories, and
 that is that the exposure was minimal.

 - 56 -
 HINSON V. CONT’L TIRE THE AMS.
 Opinion of the Court

Q. Well, let me ask you, sir. [W]hen you gave your report
and had your opinions about [Plaintiffs], you did not at any
time mention the fiber levels. Did you, sir, or the industrial
hygiene results?

A. I don’t believe I did.

Q. All right. And you’ve testified repeatedly . . . that
patient histories are the best indicator of exposures, even
over specific fiber levels. Has that been your testimony,
sir?

A. Well, it’s very rare for me to get . . . specific fiber levels.
So, yes, that has been my testimony in the past. And as a
physician, we take occupational histories. That’s what we
do.

....

Q. Sir, . . . you do require an occupational environmental
history, but you go along to also require that the industry
and occupation place the patient at an increased risk. And
also, you require a marker of exposure, usually pleural
plaque, sir. Do you see that?

A. I don’t require all three. I require an occupational, and
environmental history that increases the patient’s risk for
asbestosis or I need a marker of exposure. If I see pleural
plaques that are bilateral, I assume that that individual is
at an increased risk.

THE COURT: And that’s the marker.

[DR. GHIO]: That’s the marker. You know, if that person
has had enough fiber, you know, even though [their
occupation is] lower in the pyramid, it’s way down at the
bottom, I assume, you know, they had bilateral plaques,
I’m going to give them the benefit of the doubt they had the
exposure.

 - 57 -
 HINSON V. CONT’L TIRE THE AMS.
 Opinion of the Court

 THE COURT: And you, in looking at all the x-rays from
 [Plaintiffs], you didn’t see anything that was a marker in
 any of them.

 [DR. GHIO]: Not a single one.

Dr. Ghio stated that his opinions were based on the following:

 [DR. GHIO]: [T]he tire industry has never been reported in
 the medical literature to be associated with asbestosis. I’ve
 looked at the industrial hygiene behind the exposures of
 [the factory], and forty years would not make the criteria
 of twenty-five fiber years. I’ve been looking at a lot of these
 chest x-rays. I’ve not seen any evidence of asbestosis. I’m
 not seeing any evidence for even those diseases that
 require very, very minute exposures to fibers, and those
 would be pleural plaques. I don’t see any evidence of a
 significant exposure. So I think because of . . . all the above,
 I don’t think an individual working at [the factory] is at
 increased risk for asbestosis. [Emphasis added].

 To the extent that the Commission relied on the air sampling results as

consistent with the testimony of Defendant’s experts that asbestos exposure at

Defendant’s plant would not be sufficient to cause Plaintiffs’ alleged asbestosis,

because the air sampling reports never indicated significantly elevated levels of dust

or asbestos fibers, the Commission did not err in considering that evidence. Had the

air sampling results shown elevated levels of asbestos during the testing periods, that

would have been relevant evidence favorable to Plaintiffs that the Commission would

have properly considered. The fact that none of the air sampling indicated elevated

asbestos levels does not alter the relevance of the evidence, nor render it

incompetent—it simply tends to support Defendant’s position more than Plaintiffs’.

 - 58 -
 HINSON V. CONT’L TIRE THE AMS.
 Opinion of the Court

It was for the Commission to determine the weight to give to that evidence, and

Plaintiffs fail to demonstrate that the Commission abused its discretion in that

regard. See Wise, 231 N.C. App. at 164, 752 S.E.2d at 175–76. This argument is

without merit.

 2. Medical Expert Evidence

 Plaintiffs argue that “the Commission erred by relying only on non-medical

expert testimony” because “the amount of exposure necessary to cause disease is a

medical question [that] only a physician can answer.” We disagree.

 Plaintiffs contend that there was “insufficient medical expert testimony for the

Commission to determine that [Plaintiffs were] not exposed to sufficient levels of

asbestosis to cause a disease.” Again, it was Plaintiffs’ burden to present evidence,

medical or otherwise, to prove sufficient exposure to asbestos—not Defendant’s

burden to prove insufficient exposure. Plaintiffs bore the burden of producing

“competent evidence to support the inference that the [exposure] in question resulted

in the injury complained of[.]” Click v. Freight Carriers, 300 N.C. 164, 167, 265 S.E.2d

389, 391 (1980). Plaintiffs rely in part on Click in support of their argument. Click

states:

 The quantum and quality of the evidence required to
 establish prima facie the causal relationship will of course
 vary with the complexity of the injury itself. There will be
 “many instances in which the facts in evidence are such
 that any layman of average intelligence and experience
 would know what caused the injuries complained of.” On
 the other hand, where the exact nature and probable

 - 59 -
 HINSON V. CONT’L TIRE THE AMS.
 Opinion of the Court

 genesis of a particular type of injury involves complicated
 medical questions far removed from the ordinary
 experience and knowledge of laymen, only an expert can
 give competent opinion evidence as to the cause of the
 injury.

Id. (citations omitted). Click was not an asbestosis case, and the injury involved in

Click required very different causation evidence. Each case is fact specific, and

Plaintiffs cite to no authority that would per se exclude reliance on non-medical expert

testimony when deciding whether a particular employment could have caused or

contributed to development of an asbestos-related disease.25

 In asbestosis cases, diagnosis of the disease itself requires expert medical

testimony. However, once asbestosis is established, expert medical testimony is not

necessarily required to establish a causal connection between the disease and the

worker’s employment. For example, if a plaintiff has been diagnosed with asbestosis,

non-medical evidence that the only place the plaintiff was exposed to asbestos was

while working for the defendant-employer should be sufficient to prove a causal

connection. This Court has reasoned: “If a plaintiff has not been exposed in prior

employment, and has asbestosis, then that could give rise to an inference that he was

exposed (and last injuriously exposed) while working for defendant-employer.”

Vaughn v. Insulating Servs., 165 N.C. App. 469, 474, 598 S.E.2d 629, 632 (2004).

Conversely, if an industrial hygienist testified that the plaintiff’s workplace

 25 Further, as noted above, Plaintiffs did not object to the testimony of Defendant’s industrial
hygienists.

 - 60 -
 HINSON V. CONT’L TIRE THE AMS.
 Opinion of the Court

contained no asbestos, the Commission could properly determine that the plaintiff

had failed to prove a causal connection. In Vaughn, the “plaintiff argued the

Commission improperly required him to produce scientific or medical evidence of

exposure to asbestos for the relevant time period while in defendant’s employ.” Id. at

473, 598 S.E.2d at 631 (citation omitted). This Court held that “[p]laintiff [wa]s

correct that there [wa]s no need for such expert testimony.” Id. “This does not mean,

however, that the Commission cannot consider expert testimony, or the lack thereof,

along with lay testimony, in weighing the evidence and determining whether

claimant has met his burden of proof.” Id. at 473, 598 S.E.2d at 632. The Commission

was free to consider all the evidence, lay and expert, to inform its conclusion that

Plaintiffs failed to meet their burden on the issues of exposure and causation.

 In addition, Plaintiffs acknowledge that their contention is not accurate,

admitting: “The Commission did rely on [Defendant’s expert] Dr. Ghio who is a

medical expert.” Plaintiffs then incorrectly argue: “The only other medical expert

offered by [] Defendant was Dr. [Selwyn] Spangenthal” (“Dr. Spangenthal”).26 For

example, Defendant also presented live testimony from Dr. Kenneth Samuel Karb,

 26 Further, Plaintiffs are also incorrect in claiming Dr. Spangenthal “testified that [Plaintiffs]
had sufficient exposure to asbestos to cause a disease.” Dr. Spangenthal was asked by Plaintiffs’
counsel, for each Bellwether Plaintiff: “And if [the individual Plaintiff’s] testimony is true [concerning
his exposure to asbestos in the factory], assuming that for the sake of my question, . . . would that
exposure have been significant . . . enough to cause disease?” Dr. Spangenthal responded “yes,” but
added “I just assume that, you know, [Plaintiff] knows where he works, and that’s his impression of
what . . . his exposure was, and that’s what I’ve noted down. Whether it’s true or not, I have no idea.”
The Commission was not required to give weight to Bellwether Plaintiffs’ own accounts of alleged
asbestos exposure—whether given as testimony during the hearings, or given to physicians taking
their histories.

 - 61 -
 HINSON V. CONT’L TIRE THE AMS.
 Opinion of the Court

Dr. David Allen Hayes (“Dr. Hayes”), and Dr. Roggli. Deposition testimony was

presented from, inter alia, Dr. Oury, Dr. Gregory S. Parsons, Dr. Robert Reuter, and

Dr. Sporn. Medical records and reports were entered into evidence from multiple

additional physicians.

 Dr. Roggli offered, inter alia, his opinions that he would not “typically expect

to see asbestos-related disease” associated with work within the tire industry, and

the medical literature supports his opinion that tire plant workers are not exposed to

a greater risk of asbestosis than the general public; that in his medical practice he

has “not seen any asbestos-related lung cancers or asbestosis, to my recollection, from

anybody . . . working with the tire industry”; that, contrary to Plaintiffs’ evidence, the

appearance of “a few short chrysotile fibers in the lung” of an individual is “exactly

what you find in lung tissue from the people from the general population”; that it

would be very unusual to examine lung tissue from the general population and fail to

find any measurable asbestos fibers; that, contrary to Plaintiffs’ evidence, asbestos

fibers less than five microns in length “would not be disease-producing”; that

approximately ninety percent of the scientific community was of the same opinion;

and that, based upon his pathological analysis of Plaintiff Jones’ lung sample, he was

“completely ruling out asbestosis[.]” Further, based on his fiber count analysis of

Plaintiff Jones’ lung tissue, Dr. Roggli testified to his opinion “within a reasonable

degree of scientific certainty,” that neither Plaintiff Jones, nor “a person in [Plaintiff]

 - 62 -
 HINSON V. CONT’L TIRE THE AMS.
 Opinion of the Court

Jones’ position” would have received “sufficient exposure to asbestos at [the factory]

. . . to contribute to an asbestos-related disease[.]”

 Dr. Ghio testified concerning why he did not trust the Plaintiffs’ experts

methodology when only ten percent of Plaintiffs diagnosed as having asbestosis also

showed signs of pleural plaques:

 [DR. GHIO:] . . . . Eighty percent of the time [patients] have
 pleural plaques if they have significant exposure to asbestos.
 ....

 THE COURT: Well, let me ask it more specifically. On a
 . . . one zero,[27] are they going to have pleural plaques?

 [DR. GHIO]: Yes, eighty percent of them will.

 THE COURT: Okay.

 [DR. GHIO]: If it’s truly the result of significant exposure to
 fibers, eighty percent of the chest x-rays[—S]omewhere
 between fifty and eighty percent—and I like the eighty
 actually. More of the studies have come out with eighty
 percent will show pleural plaques if it is attributable—if it’s
 truly the result of fiber exposure. [Emphasis added].

Dr. William Franklin Alleyene, II (“Dr. Alleyene”), Plaintiffs’ expert, agreed that

pleural plaques will be present in approximately eighty percent of people who have

asbestosis. Dr. Ghio further testified:

 [DR. GHIO:] [T]here have been many diagnoses of
 asbestosis that I’ve made on individuals who have come in,
 and they’re part of that twenty percent or the fifty percent
 that don’t have pleural plaques. But that’s an individual.

 27 The deputy commissioner is referring to a B-readers assessment of 1/0 as explained in
finding of fact 25.

 - 63 -
 HINSON V. CONT’L TIRE THE AMS.
 Opinion of the Court

 When you have a group of 157, you have the benefit of
 numbers here. And if in 157 individuals you’re looking at
 zero plaques, then you have to come to some conclusion
 about the exposure.

 THE COURT: Well, you’re saying—basically from your
 testimony, if I’m—and I want to make sure I understand
 what you’ve testified correctly. I’m just trying to clarify.
 Out of the 158, you would expect something like 120 to
 have pleural plaques on their x-rays.

 THE WITNESS: That is correct.

 THE COURT: Therefore, and because there are no pleural
 plaques, if other people are diagnosing one zeros on 157 x-
 rays, [and] somewhere about . . . 75 or so to 120 don’t have
 pleural plaques, you’re saying that those x-rays generally
 are being misread.

 [DR. GHIO]: That’s correct.

 ....

 [DR. GHIO]: And there’s nothing in the medical literature
 to support this possibility.

Dr. Ghio then expresses his medical expert opinion that Plaintiffs were not exposed

to sufficient asbestos working at the factory to cause disease:

 I don’t think that any contribution . . . from the work
 environment [in the factory] would significantly increase
 one’s risk [of contracting an asbestos-related disease].
 But[, hypothetically,] these individuals may have [been
 exposed to significant amounts of asbestos fibers in prior
 employment]. . . . I believe that they could be diagnosed to
 have asbestosis if they’re a Continental Tire worker, but it
 had nothing to do with the environment at [the factory].

 THE COURT: To any degree?

 - 64 -
 HINSON V. CONT’L TIRE THE AMS.
 Opinion of the Court

 [DR. GHIO]: To any degree.

 In addition, Plaintiffs’ expert Dr. Alleyene, testified concerning the superiority

of CT scans over x-rays in diagnosing asbestosis:

 X-rays are based on technology that’s over a hundred years
 old, and it’s like looking at something with a naked eye
 when you’ve got a microscope right next to you. And I can
 see things on a CT scan that is—are much more detailed
 [and] three-dimensional, and, also, it takes a lot of the
 guess work out of it. The—somebody looks at an x-ray, a
 B-reader, and they say, “Well, gee, I see these shadows, and
 they look like 1/0” versus on a CT scan I can see fibrosis, I
 can see pleural plaquing, I can see all types of things and
 so when physicians talk about making that diagnosis
 whether it’s in a board review course or anything, no one
 even mentions a B-read chest x-ray. That is something
 that exists only in the courtroom. Physicians, when we talk
 about asbestosis, when we talk[] about diagnosing
 asbestosis and how to manage patients with asbestosis, we
 speak specifically about high resolution CT scans. We don’t
 even talk about an x-ray other [than] to say, “Gee, if your
 x-ray is unclear or suspicious, you get a CT scan to
 confirm.”

The deputy commissioner, based on Dr. Alleyene’s testimony, proposed that Plaintiffs

and Defendant agree to allow independent doctors who were experts in asbestos-

related diseases to administer and analyze high resolution CT scans of every living

Plaintiff. Defendant wanted the deputy commissioner to order Plaintiffs to obtain

high resolution CT scans, and Defendant agreed to pay for the procedures and the

analysis. Plaintiffs’ counsel informed the trial court that they would not agree to

having Plaintiffs undergo high resolution CT scans. The deputy commissioner

responded that Plaintiffs’ refusal “cuts both ways. And based on—based on the

 - 65 -
 HINSON V. CONT’L TIRE THE AMS.
 Opinion of the Court

evidence I have heard thus far, I again say that decision . . . cuts both ways—okay—

cuts both ways because [P]laintiffs have the burden of proof here[.]”

 Both Plaintiffs and Defendant presented medical expert testimony that the

only certain method of diagnosing asbestosis is to examine a sufficient sample of the

patient’s lung tissue. Plaintiffs’ attorney, in response to the deposition testimony of

Dr. Spangenthal that CT scans were “the gold standard” for diagnosing asbestosis,

stated: “Actually, the gold standard would probably be a biopsy, isn’t it?” Dr.

Spangenthal agreed, noting that he was referring to procedures that he would

generally perform on living patients. When Plaintiffs’ expert, Dr. Alleyene, was

asked if there were any symptoms that are “pathopneumonic” for asbestosis—i.e. “a

sign or a symptom or a finding that would be so closely correlated with a specific

disease entity as to be virtually diagnostic”—he responded:

 There are what we call asbestos bodies[.] And if one found
 a certain concentration of asbestos bodies per gram of lung
 tissue, that would be pathopneumonic of asbestosis.
 Having said that, the way that you would get that tissue
 would require a procedure that is fairly invasive called an
 open-lung biopsy where they literally spread your ribs,
 take a piece of lung tissue that would be significantly larger
 than one could obtain from other methods[.] This—you
 would get a nice wedge of lung tissue, literally. And if they
 then prepped that tissue . . . and looked at it under an
 electron microscope, you could see these linear—they’re not
 fibers but they’re actually coated asbestos fibers, and they
 call them asbestos bodies[.] And if one has an open-lung
 biopsy and if one has the finding of these asbestos bodies
 or sufficient numbers of these asbestos bodies either in the
 tissue itself or in the lung fluid . . ., then that would be
 pathopneumonic.

 - 66 -
 HINSON V. CONT’L TIRE THE AMS.
 Opinion of the Court

 Q. Short of taking a wedge of somebody’s lung, there’s
 nothing pathopneumonic about asbestosis?

 A. That is correct.

 Dr. Oury agreed with Dr. Alleyene that “pathology [is] still the only way to

definitively diagnose asbestosis[.]” Dr. Hayes also testified for Defendant, and agreed

that pathology is the most accurate way to diagnose asbestosis, followed by high

resolution CT scan. When Dr. Roggli was asked: “Would it be safe to say that, if you

don’t have it pathologically, you don’t have it?” He responded: “Correct. That is

assuming that you have a reasonable, decent sample of tissue, that would be correct.”

Dr. Roggli also testified that the best tool for diagnosing asbestosis is “pathologic

examination,” followed by “high-resolution CT—regular CT would be less sensitive,

and least sensitive would be the routine chest x-ray.” Plaintiffs provided Defendant

lung tissue from five of the eighteen deceased Plaintiffs; Defendant submitted lung

tissue from all five for pathological examination, and none of the lung tissue from

these deceased Plaintiffs, including Plaintiff Hinson, showed asbestos bodies or other

signs of disease related to asbestos exposure.

 In Plaintiffs’ brief, they argue that the “Commission ignored the testing done

by Plaintiffs’ pathologists. This testing irrefutably showed excess levels of asbestos

in the lungs of the workers.” However, Plaintiffs did not offer testimony from any

 - 67 -
 HINSON V. CONT’L TIRE THE AMS.
 Opinion of the Court

pathologists.28 The Commission can “consider expert testimony, or the lack thereof,

along with lay testimony, in weighing the evidence and determining whether

claimant has met his burden of proof.” Vaughn, 165 N.C. App. at 473, 598 S.E.2d at

632.

 The common issues findings of fact demonstrate that evidence from medical

experts factored heavily in the determinations of the Commission—see findings 1, 25,

26, 27, 28, 29, 30, 32, 33, 34, 35, 36, 37, 38, 39, 40, 41, 42, 43, and 44—the Commission

simply gave the testimony of certain of Defendant’s medical experts greater weight.

It was the province of the Commission to determine the credibility of, and the weight

to be given to, the various expert witnesses, including the medical experts. Wise, 231

N.C. App. at 164, 752 S.E.2d at 175–76.

 Because Plaintiffs had “the burden of proving [their claims] by . . . a

‘preponderance of the evidence[,]’” they were required to “present credible evidence of

[sufficient asbestos] exposure[.]” Id. We hold that the Commission properly relied on

both medical and non-medical evidence—expert and lay—when considering the issue

of causation in this matter. Plaintiffs’ refusal to agree to certain more accurate

medical procedures was also proper to consider. Id. Plaintiffs’ argument is without

merit.

 3. Extrapolating the Evidence

 28
 The only record evidence of Plaintiffs having obtained analysis of a deceased Plaintiff’s lung
tissue was the fiber count done on Plaintiff Jones’ lung tissue by Rigler—who is not a medical doctor.

 - 68 -
 HINSON V. CONT’L TIRE THE AMS.
 Opinion of the Court

 As part of the section challenging certain findings of fact, Plaintiffs include the

following two sentence argument: “[T]he Commission is attempting to use lung tissue

samples from some workers to determine the amount of asbestos in the lungs of all

[Plaintiffs]. That is speculation and there was no evidence of the relevance of the

lung pathology to other workers.” We hold the results of the lung tissue analyses of

the deceased Plaintiffs were a proper factor for the Commission to consider, and were

relevant to the Commission’s decision. Plaintiffs’ brief includes testimony from

multiple witnesses contending that exposure to asbestos in the curing department

was worse than anywhere else in the plant. Plaintiffs argue on appeal that “[t]he

condition of the insulation was especially bad in the curing department.” In finding

32, the Commission determined: “Pathological examination of lung tissue is a

definitive method of determining whether an individual has an asbestos-related

disease.” In finding 37, the Commission found that Plaintiff Hinson worked in the

factory

 for 32 years, mainly in the curing department. The curing
 department had the highest concentration of insulated
 piping in the factory, with much of it at floor level or in
 exposed trenches. According to decedent Hinson, he was
 also exposed to significant asbestos dust from using a band
 saw to cut large asbestos gaskets. If [P]laintiffs’ arguments
 are correct, decedent Hinson would have been exposed to a
 significant amount of airborne asbestos. . . . . Dr. Craig
 Hart at York pathology performed [P]laintiff Hinson’s lung
 autopsy. Dr. Hart found no evidence of asbestos bodies or
 fibrosis, but did see evidence of smoking. The tissue was
 sent to Dr. Oury, who examined the sample and confirmed
 Dr. Hart’s conclusions. Although it was not required for

 - 69 -
 HINSON V. CONT’L TIRE THE AMS.
 Opinion of the Court

 diagnostic purposes due to the lack of fibrosis, a fiber count
 analysis was done by Dr. Oury upon [D]efendant’s request.
 The fiber count analysis found 5 asbestos bodies per gram,
 which is a level well below that seen in individuals with
 asbestosis and in the range of control individuals with no
 history of asbestos exposure.

 Despite Plaintiffs’ arguments and evidence suggesting Plaintiff Hinson should

have been exposed to more airborne asbestos than Plaintiffs who worked in other

areas of the factory, Plaintiff Hinson’s lung pathology demonstrated that not only did

he not have asbestosis, his exposure to asbestos was at “a level well below that seen

in individuals with asbestosis and in the range of control individuals with no history

of asbestos exposure.” This evidence was relevant to the Commission’s decision

regarding the overall levels of airborne asbestos in the factory, and properly

considered for that purpose.

 Plaintiffs also argue that they were exposed to significant levels of asbestos in

other areas of the factory. Plaintiffs claim that the asbestos insulation in the plant

that “was in a damaged, deteriorated and [] dangerous condition” was “located in the

work areas of the employees including the [P]laintiffs herein.” One of Plaintiffs’

witnesses testified that “the insulation was torn off, beaten off, and looked ragged[,]”

and “that this condition was consistent throughout the plant.” Plaintiffs agree in

their brief that “[t]he poor condition of the asbestos insulation was not restricted to a

single area but was consistent throughout the plant.” In addition, Plaintiffs argue

they were exposed to airborne asbestos fibers throughout the plant due to the use of

 - 70 -
 HINSON V. CONT’L TIRE THE AMS.
 Opinion of the Court

talc contaminated with chrysotile asbestos; and the removal, replacement, and repair

of gaskets and brakes that contained chrysotile asbestos. Plaintiffs argued to the

Commission that the factory was “a very dusty plant” and that any plaintiff who

worked throughout the factory “would have been in each of these departments and

subject to the same type of exposures [as] everyone else.”

 In finding 34, the Commission stated: “Of the five deceased [P]laintiffs who

had post-mortem pathological study of their lung tissue, (Walter Hinson, Johnnie

Jones, Charles Gibson, Homer Hunt, and Lloyd Cox), none had pathological evidence

of asbestosis. Pathology is the most reliable method to diagnose asbestosis.” In

findings 38, 39, 40, and 41, the Commission determined that deceased Plaintiff Jones

worked for twenty-five years in the calendar area—where he would have been

exposed to talc, along with pipe insulation; deceased Plaintiff Gibson worked for

thirty-one years in the tire-building and warehouse departments; deceased Plaintiff

Hunt worked for seventeen years throughout the factory as a mechanic—which would

have exposed him to the alleged brake-related asbestos dangers as well as all other

alleged causes of airborne asbestos in the factory; and deceased Plaintiff Cox worked

for thirty-one years in the stock and bead preparation areas. The Commission

determined in finding 42: “Despite Plaintiffs’ theories of exposure, pathology results

from the lung tissue of five long-term employees from a variety of departments and

factory locations uniformly show a lack of fibrosis, a lack of asbestos bodies, and a

lack of fibers.”

 - 71 -
 HINSON V. CONT’L TIRE THE AMS.
 Opinion of the Court

 The above findings of fact illustrate the relevance of the pathological

examinations to the general issue of whether employment at the plant served to

expose Plaintiffs to asbestos of the type and quantity that could cause or significantly

contribute to the development of an asbestos-related disease. The lung tissue

pathology was direct evidence that none of the deceased Plaintiffs had asbestosis or

other asbestos-related diseases, and was also circumstantial evidence supporting the

Commission’s determination that Plaintiffs had failed to prove “a causal connection

between asbestosis and employment at the . . . factory.”

 4. The Entire Record

 Plaintiffs challenge the Commission’s findings 16, 19, 21, 23, 43, 44, and 45,

because the Commission stated that it was basing its determinations on “the greater

weight of the evidence in view of the entire record.” Plaintiffs argue that the “entire

record” language demonstrates that the Commission based these findings, in part, on

incompetent evidence and, therefore, these findings and conclusions are invalid.

Plaintiffs argue: “The ‘entire record’ consisted of the air sampling and testimony of

experts regarding the amount of exposure for each [P]laintiff and the amount

necessary to cause disease. As stated herein, [Plaintiffs] find[] that such evidence is

not competent. Regardless, the Commission based its opinions on that evidence.”

Plaintiffs also contend that “all of the testimony relied upon by the Commission to

establish the levels of exposure were based upon air sampling.” As the Commission’s

findings of fact, and the small sampling of the expert testimony included herein

 - 72 -
 HINSON V. CONT’L TIRE THE AMS.
 Opinion of the Court

demonstrates, the Commission relied primarily on expert medical testimony, not air

sampling, and Plaintiffs’ argument fails for this reason.

 In addition, “[b]efore the Commission makes findings of fact, it ‘must consider

and evaluate all of the evidence. Although the Commission may choose not to believe

the evidence after considering it, it may not wholly disregard or ignore competent

evidence.’” File v. Norandal USA, Inc., 232 N.C. App. 397, 400, 754 S.E.2d 202, 205

(2014) (citation omitted). It would have been improper for the Commission not to

have considered “the entire record” before making its determinations. Further, the

Commission is not required to make specific findings indicating the evidence it is not

relying on. Bryant v. Weyerhaeuser Co., 130 N.C. App. 135, 139, 502 S.E.2d 58, 62

(1998). Finally, “findings of fact which are supported by competent evidence are

conclusive on appeal, even though other incompetent evidence may have been

improperly admitted.” Kennedy, 101 N.C. App. at 33, 398 S.E.2d at 682 (citation

omitted). This argument is without merit.

 C. Findings of Fact

 Plaintiffs contest certain findings of fact, in whole or in part.29 Our review is

limited to “whether the findings of fact are supported by competent evidence[.]”

Penegar, __ N.C. App. at __, 815 S.E.2d at 394 (citation omitted). Uncontested

findings are binding on appeal. Id. We include as “unchallenged” many findings of

 29Plaintiffs challenge some of the “common issue” findings in certain individual briefs, but not
others. For the sake of clarity, we address the challenges from all of the bellwether briefs related to
common issues in this opinion.

 - 73 -
 HINSON V. CONT’L TIRE THE AMS.
 Opinion of the Court

fact that Plaintiffs purport to challenge on appeal—because Plaintiffs’ “challenges” to

these findings are not based on any alleged insufficiency of supporting evidence. Id.

 Plaintiffs challenge certain findings based on the following sentence: “In

Findings of Fact 43, 44, 45, 47 the Commission relies on evidence that is not

competent for the reasons set forth herein.” That is the totality of the challenge, and

it is not sufficient for appellate review. Plaintiffs challenge findings 12, 13, 14, 15,

16, 18, 19, 21, and 23 by arguing that the Commission should not have relied on the

air sampling reported in these findings. However, Plaintiffs do not contend that the

findings themselves are not supported by competent evidence. These findings simply

state uncontested facts concerning the air sampling done at the factory, and do not

include any indication of how, or if, the Commission relied on these findings to make

its decisions.30

 Plaintiffs challenge findings 15, 35, 36, 37, 38, 39, 40, 41, 42, 44, and 47, on the

basis that the Commission “gave more credibility to [the opinions and testimony of]

Defendant’s experts” and “failed to consider, and plainly ignored, the evidence that

contradicted” the opinions of Defendant’s experts. Again, this is not an argument

concerning whether there was sufficient evidence to support these findings—

Plaintiffs simply argue that they disagree with the weight and credibility

 30 Findings 16, 19, 21, and 23 are ultimate findings, but they are not properly challenged in
this section.

 - 74 -
 HINSON V. CONT’L TIRE THE AMS.
 Opinion of the Court

determinations of the Commission.31 That is not a valid challenge to findings of fact,

and this Court is without authority to make the determinations Plaintiffs ask of it:

 In passing upon issues of fact, the Industrial Commission
 is the sole judge of the credibility of the witnesses and the
 weight to be given to their testimony. The Commission
 may accept or reject the testimony of a witness solely on
 the basis of whether it believes the witness or not. The
 findings of the Industrial Commission are conclusive on
 appeal when supported by competent evidence even though
 there be evidence to support a contrary finding.

Hilliard v. Apex Cabinet Co., 305 N.C. 593, 595, 290 S.E.2d 682, 683–84 (1982)

(citations omitted). Therefore, these “unchallenged” findings of fact are binding on

appeal.32 Penegar, __ N.C. App. at __, 815 S.E.2d at 394.

 Plaintiffs challenge finding 11, arguing that the Commission’s determination

that the greater weight of the evidence did not support a finding that there were high

levels of airborne particulates in the curing department “ignores evidence and

misstates the evidence. Plaintiff[s] never suggested that workers were damaging the

asbestos on the pipes every minute of every day. It was occasional exposures.” We

agree that “high levels of airborne particulates in the curing department originating

from damaged pipe insulation and gasket-sawing” would have been intermittent.

However, there was sufficient evidence to support this finding as written. As the

Commission stated in its ultimate finding 43:

 In occupational disease cases, a causal connection between

 31 Finding 47 is an ultimate finding or conclusion, but Plaintiffs’ argument is insufficient to
challenge this conclusion as well.
 32 We further hold that all these findings of fact are supported by competent record evidence.

 - 75 -
 HINSON V. CONT’L TIRE THE AMS.
 Opinion of the Court

 the employment and the alleged disease must be proven.
 This analysis includes the extent of exposure. Of necessity,
 evidence on the subject of causation in these cases is often
 circumstantial. Given the evidence of air contaminant
 measurements taken at [D]efendant’s factory, the
 pathology evidence collected from workers’ lungs, and the
 scientific and epidemiological literature presented on the
 subject, the greater weight of the evidence in view of the
 entire record does not demonstrate a causal connection
 between asbestosis and employment at the . . . factory.

 The Commission is correct in its statement of law: “In the case of occupational

diseases proof of a causal connection between the disease and the employee’s

occupation must of necessity be based on circumstantial evidence.” Booker, 297 N.C.

at 476, 256 S.E.2d at 200. The pathology evidence, the testimony of Defendant’s

medical experts and industrial hygienists, the scientific and epidemiological

literature, and other evidence presented, constituted sufficient evidence to support

the finding that “the greater weight of the evidence [did] not support” that there were

“high levels of airborne particulates in the curing department originating from

damaged pipe insulation and gasket-sawing”—even though Plaintiffs presented

evidence in support of a contrary finding.

 Plaintiffs also argue that in finding 12 the Commission “completely ignored the

fact that the 1979 study was not measuring for asbestos.” However, finding 12

correctly states that the study “measured for dust—both airborne and respirable, as

well as petroleum distillates, rubber solvent, Benzene, and Toulene. The dust

measurements would have measured any particulates in the air—whether the

 - 76 -
 HINSON V. CONT’L TIRE THE AMS.
 Opinion of the Court

particulates were asbestos, talc, or something else.” We hold that all of the “common

issues” findings of fact included in this opinion are binding on appeal.

 D. Ultimate Findings and Conclusions of Law

 Plaintiffs do not challenge the following ultimate findings/conclusions and they

are therefore binding on appeal:

 46. Plaintiff Charles Wilson[], one of the “initial five”
 plaintiffs, alleges that he also contracted colon cancer as a
 result of exposure to asbestos at the . . . factory. However,
 the greater weight of the evidence in view of the entire
 record shows that colon cancer is an ordinary disease of life
 to which the public is equally exposed. The greater weight
 of the evidence in view of the entire record does not show
 that colon cancer is characteristic of persons engaged in the
 tire manufacturing industry or that working at the
 . . . factory placed those who worked there at an increased
 risk of developing colon cancer.

 47. Plaintiff Epps[], one of the “initial five” plaintiffs,
 alleges that he also contracted tonsil cancer as a result of
 exposure to asbestos at the . . . factory. However, the
 greater weight of the evidence in view of the entire record
 shows that tonsil cancer is an ordinary disease of life to
 which the public is equally exposed. The greater weight of
 the evidence in view of the entire record does not show that
 tonsil cancer is characteristic of persons engaged in the tire
 manufacturing industry or that working at the . . . factory
 placed those who worked there at an increased risk of
 developing tonsil cancer.

 Plaintiffs challenge ultimate finding 16, which states:

 16. The greater weight of the evidence in view of the entire
 record shows that plaintiffs were neither exposed to
 airborne asbestos as a result of damaged pipe insulation in
 such form and quantity and with such frequency as to
 cause or significantly contribute to the development of

 - 77 -
 HINSON V. CONT’L TIRE THE AMS.
 Opinion of the Court

 asbestosis, nor were plaintiffs exposed to the hazards of
 asbestosis through this method in this employment for 30
 days or parts thereof within a seven month consecutive
 period which proximately augmented the disease process
 of asbestosis to the slightest degree.

Plaintiffs argue: “In short, the Commission found that [P]laintiffs were not exposed

to asbestos in a sufficient amount from damaged pipe insulation to cause asbestosis.

This finding was based upon ‘the entire record.’” Plaintiffs then state:

 The Commission also found the exposures from asbestos-
 containing talc, gaskets and brakes were insufficient to
 cause disease based upon the entire record. (Findings of
 Fact 19, 21, 23). The “entire record” consisted of the air
 sampling and testimony of experts regarding the amount
 of exposure for each [P]laintiff and the amount necessary
 to cause disease. As stated herein, Plaintiff[s] find[] that
 such evidence is not competent. Regardless, the
 Commission based its opinions on that evidence.

Plaintiffs contest ultimate findings 43 and 45 on the same grounds.33 We have

already addressed Plaintiffs’ argument above—in section IV. B. 4. of this opinion—as

well as noting that Plaintiffs failed to challenge the Commission’s “last injurious

exposure” determinations made pursuant to N.C.G.S. § 97-57. In addition, we hold

that there is sufficient competent record evidence to support the Commission’s

ultimate findings.34 Culpepper, 93 N.C. App. at 247, 377 S.E.2d at 780.

 33 All of these ultimate findings are determinations that Plaintiffs’ alleged injuries did not
“arise out of” their employment at the factory. See Culpepper, 93 N.C. App. at 247, 377 S.E.2d at 780.
 34 To the extent, if any, that the ultimate findings are, or contain, conclusions of law, Plaintiffs

abandoned any challenge to them because they have failed to argue that they are not supported by the
findings of fact. In addition, we hold that any conclusions in the common issues section of the
bellwether opinions and awards are supported by the findings of fact.

 - 78 -
 HINSON V. CONT’L TIRE THE AMS.
 Opinion of the Court

 Findings 43 and 45 state in relevant part:

 43. . . . . Given the evidence of air contaminant
 measurements taken at [the] factory, the pathology
 evidence collected from [deceased Plaintiffs’] lungs, and the
 scientific and epidemiological literature presented on the
 subject, the greater weight of the evidence in view of the
 entire record does not demonstrate a causal connection
 between asbestosis and employment at the . . . factory.

 ....

 45. The greater weight of the evidence in view of the entire
 record does not show that [P]laintiffs, through their
 employment at [the] factory, were exposed to asbestos in
 such form and quantity and used with such frequency as to
 cause or significantly contribute to the development of
 asbestosis[.]

 Because both ultimate findings 43 and 45 include determinations that

Plaintiffs failed to meet their burden of proving a sufficient causal relationship

between employment at the factory and their alleged asbestosis, these ultimate

findings defeat Consolidated Plaintiffs’ asbestosis claims. Because the Commission

determined in “findings” 46 and 47 that Plaintiffs have failed to prove that either

colon cancer or tonsil cancer are “occupational diseases” as defined by N.C.G.S. § 97-

53(13), these determinations also apply to the outstanding consolidated cases.

 E. Conclusion—Common Issues Arguments

 We affirm the Commission’s common issues determinations. It did not err in:

(1) Determining Plaintiffs failed to prove a causal connection between employment at

the factory and asbestosis; (2) its determination, based upon the facts presented, that

 - 79 -
 HINSON V. CONT’L TIRE THE AMS.
 Opinion of the Court

Plaintiffs failed to prove that either colon cancer or tonsil cancer were occupational

diseases pursuant to N.C.G.S. § 97-53(13); or (3) its unchallenged determination that

Plaintiffs were not last injuriously exposed to the hazards of asbestosis at the factory.

Further, we hold that the Commission’s findings and ultimate findings are supported

by competent evidence, and its conclusions and rulings are supported by the findings.

 V. Plaintiff Hinson’s Appeal

 Although we affirm the Commission’s opinion and award based on our holdings

set forth above, we will also address the findings and conclusions specific to Plaintiff

Hinson. Initially, Plaintiff Hinson does not make any argument that the findings of

fact fail to support the conclusions of law; therefore, the conclusions of law stand.

Penegar, __ N.C. App. at __, 815 S.E.2d at 394. For example, Plaintiff argues that, in

support of conclusion of law 3, “the Commission . . . relied, in large part, on a

determination of the amount of asbestos that [P]laintiff inhaled and how much was

necessary to cause disease.” Conclusion 3 states in part: “[I]n this case, it was not

established, by the preponderance of the evidence in view of the entire record, that

[Plaintiff] contracted asbestosis or any asbestos-related condition.” Plaintiff argues

this conclusion is not supported by competent evidence, but does not make an

argument that the findings of fact fail to support this conclusion—therefore, this

conclusion of law stands. Id.

 Assuming, arguendo, Plaintiff Hinson has preserved challenge to the findings

and conclusions specific to him, we hold that competent evidence supports the

 - 80 -
 HINSON V. CONT’L TIRE THE AMS.
 Opinion of the Court

relevant findings of fact and ultimate findings, which support the Commission’s

relevant conclusions of law. Id. Plaintiff Hinson does not challenge finding 34 which

states in part that the “post-mortem pathological study of” Plaintiff Hinson’s “lung

tissue” revealed no “pathological evidence of asbestosis. Pathology is the most

reliable method to diagnose asbestosis.” Findings 55, 57, 58, 60, 61, 62, and 63 are

also unchallenged. These findings include determinations by multiple doctors that

Plaintiff Hinson’s x-rays did not show evidence of pleural abnormalities or asbestosis;

that after Plaintiff Hinson told his treating physician of his asbestosis diagnosis, his

physician told Plaintiff Hinson “to inform his attorney that the abnormal x-ray was

due to pneumonia”; and that though Plaintiff Hinson “testified vehemently that he

never smoked,” medical records and his pathology results indicated he had “a remote

smoking history.”

 The Commission found in findings 37 and 64 that during pathological

examination of Plaintiff Hinson’s lung tissue, “Dr. Hart found no evidence of asbestos

bodies or fibrosis, but did see evidence of smoking[,]” a conclusion “confirmed” by Dr.

Oury, who also conducted a fiber count analysis and found results “well below that

seen in individuals with asbestosis and in the range of control individuals with no

history of asbestos exposure.” Plaintiff Hinson’s only argument concerning these

findings is that the Commission “ignore[d] the pathology findings of [P]laintiff’s

experts.” As noted above, Plaintiffs did not present any evidence from pathologists.

To the extent Plaintiffs—including Plaintiff Hinson—mean to include non-

 - 81 -
 HINSON V. CONT’L TIRE THE AMS.
 Opinion of the Court

pathologist medical doctors, or non-physician scientists who work with lung tissue,

under the definition of “pathologists,” it was the province of the Commission to weigh

the evidence and the credibility of the witnesses. Because there is some competent

evidence to support these findings, they are conclusive on appeal. Plaintiff challenges

finding 65, in which the Commission states that Defendant’s medical experts were

“given greater weight than” Plaintiffs’. Plaintiff Hinson’s challenge to this finding is

based on Plaintiffs’ rejected “entire record,” “air sampling,” and “fiber year theory”

arguments.

 Our review of the record demonstrates that the evidence supports the ultimate

finding—included in finding of fact 66 and conclusions of law 2 and 4—that Plaintiff

Hinson failed to prove a causal connection between his employment at the factory

and his alleged asbestosis. We further hold that the Commission’s findings, which

are based on substantial competent evidence, support conclusion 3, in which the

Commission determined that Plaintiff Hinson failed to prove he had asbestosis.

Finally, Plaintiff Hinson does not challenge the determination made pursuant to

N.C.G.S. § 97-57 that he was not “last injuriously exposed” to the hazards of

asbestosis at the factory. For all the above reasons, we affirm the denial of Plaintiff

Hinson’s claim.

 AFFIRMED.

 Judges DIETZ and COLLINS concur.

 - 82 -